SALVADOR A. LOMBARDO, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 18009–81, 16224–82,   Filed September 28, 1992.
18017–82, 18448–82,
26377–82,   5803–88.

---

[1] Cases of the following petitioners are consolidated herewith: Salvador A. Lombardo, docket No. 16224–82; E. Harrison Van O'Linda and Jean C. Van O'Linda, docket No. 18017–82; Albert R. Carter and Ella B. Carter, docket No. 18448–82; Roy M. Axford, docket No. 26377–82; and Cyril E. Davies and Michele N. Davies, docket No. 5803–88.

*John Harrison Wegge,* for petitioners in docket Nos. 18009–81, 18448–82, 26377–82, and 5803–88.

*John Harrison Wegge, Michael Worth Brown,* and *Maria Heidi Husnak,* for petitioners in docket Nos. 16224–82 and 18017–82.

*Donna F. Herbert* and *Mark A. Weiner,* for respondent.

## OPINION

GERBER, *Judge:* Petitioners were part of a large litigation project for which test cases were tried and the issues addressed in a Memorandum Opinion of this Court, *Abeson v. Commissioner,* T.C. Memo. 1990-190, affd. without published opinion sub nom. *Rivera v. Commissioner,* 959 F.2d 241 (9th Cir. 1992). Following the opinion on the project issues, which was unfavorable to petitioners, they were ordered to show cause why a similar or the same issue in their cases should not be decided in the same manner as the test case. Petitioners, one of whom was pro se at the time, either did not come forward or made inadequate showings and the orders were made absolute. Subsequently, petitioners moved to vacate the orders. After a preliminary hearing, these cases were set for hearing on the motion to vacate and for trial of any other issues which were not resolved by the prior Memorandum Opinion.

In this opinion we consider whether respondent's agents violated the secrecy requirements of rule 6(e) of the Federal Rules of Criminal Procedure (rule 6(e)) and, if they did, the appropriate sanction, if any, that should be prescribed by this Court.

A second issue in this case involves the question of whether petitioner Salvador A. Lombardo (petitioner Lombardo or Mr. Lombardo) filed a 1977 return. All other issues have been resolved by the parties or by order(s) of this Court. Each of the petitioners herein resided in California at the time of the filing of their petitions.

## Procedural Background

These consolidated cases involve several sets of petitioners, each of whom was involved in a tax scheme promoted by a law firm known as Berg & Allen. The taxable years before the Court in these cases are 1975 through 1980. Some of the tax consequences of the scheme were decided as part of several test cases as set forth by an April 1990 Memorandum Opinion which addressed a substantive and two procedural issues. *Abeson v. Commissioner, supra.* The scheme was described in that Memorandum Opinion, in pertinent part, as follows:

During the years 1977 through 1981, petitioners engaged Berg & Allen to prepare their income tax returns * * * [and a presentation was made to petitioners] outlining an investment plan * * * [to] enable petitioners to recover large amounts of taxes previously paid with respect to prior years' returns. * * * petitioners invested in various master recording limited partnerships. Some petitioners wrote personal checks payable for their cash investment. Petitioners also executed nonrecourse promissory notes. * * * the personal checks were not cashed * * * [and] It was understood by petitioners [that] the partnership investment would be funded by the tax refunds generated by the credits and deductions claimed from the investment. * * *

* * * the individual returns and claims for refund were based upon improper deductions and credits.

All the individual returns and claims for refund reflected petitioners' names c/o Berg & Allen with the address of the Firm. * * * When the refund checks were received by Berg and Allen, petitioners were contacted and advised of the receipt of the refund. In some instances petitioners endorsed the refund checks. In other instances the Firm signed petitioners' names or stamped the back of the check with the Firm's name. * * * The Firm then applied the funds to pay petitioners' investment and tax

preparation fees. A Firm check for the balance was issued to each petitioner. * * *

The taxpayers in *Abeson* argued that they should be given offsets in the amount of the refunds received by Berg & Allen against any deficiency finally determined by the Court. The Court decided that the taxpayers should be treated as having received their respective refunds which had been mailed to them at the office of Berg & Allen.[2] After issuance of the above-referenced opinion, the trial judge issued orders requiring each remaining taxpayer-petitioner involved in the Berg & Allen litigation group to show cause why he should not be bound to the holding in *Abeson*.

Following the withdrawal of petitioner Lombardo's attorney, due to a "conflict of interest",[3] one of the petitioners in these consolidated cases was given additional time to show cause. No adequate showing was made, and the orders to show cause were made absolute in that the substantive issue decided in *Abeson* was found to control that same issue in each petitioner's case. Thereafter, these cases were removed from the special litigation project involving Berg & Allen and returned to the general docket for trial in due course with respect to any issues remaining (other than the issue resolved pursuant to *Abeson* and the orders to show cause).

These cases were set for trial at the session scheduled for Los Angeles, California (at Pasadena), commencing September 23, 1991. Petitioners, at that juncture, moved to vacate the show cause orders which had been made absolute. After oral argument on behalf of petitioners with respect to the possibility of rule 6(e) violations and a discussion of the plausibility of possible remedies, these consolidated cases were set for trial beginning February 24, 1992, on the rule 6(e) issue[4] and any remaining issues other than the one(s)

---

[2] The Court also decided that the Commissioner had not improperly utilized grand jury information and that the taxpayers had failed to establish that the Commissioner did not comply with discovery orders or withhold documents in response to discovery.

[3] The purported conflict of interest was explained in Attorney Wegge's motion for withdrawal as a failure of petitioner Lombardo to pay his share of the "Berg & Allen litigation expense" which conflicted with the rights of petitioners who had paid. Apparently, petitioner Lombardo thereafter agreed to pay and Attorney Wegge entered his appearance. All petitioners herein are represented by Attorney Wegge.

[4] Although *Abeson v. Commissioner*, T.C. Memo. 1990-190, affd. without published opinion sub nom. *Rivera v. Commissioner*, 959 F.2d 241 (9th Cir. 1992), contains the conclusion that "there is no evidence any Grand Jury information was available to or used by IRS agents who conducted the civil examination or prepared the notices of deficiency", that same opinion also con-

decided in *Abeson* which the parties were unable to settle. The parties settled all such issues with the exception of the issue of whether petitioner Lombardo filed a 1977 Federal income tax return.

## Positions of the Parties

Petitioners argue that a list of clients' names (from which petitioners allege that respondent identified them and began civil examinations) was grand jury matter[5] which was wrongfully disclosed and used for civil purposes. If we agree with petitioners, then we must consider whether a sanction should be employed and, if so, which sanction would be appropriate under the circumstances.

Petitioners structure their argument beginning with the threshold legal question of whether the list of names (which included the identities of petitioners herein) was, by definition, grand jury matter. Respondent attempts to preempt that question by arguing that the record reflects that the list referred to by petitioners was not used by respondent's civil auditors to identify petitioners for purposes of examination.

If the list was used by respondent's civil auditors to identify petitioners, we must determine whether the list was grand jury matter. Literally, rule 6(e) prohibits the disclosure of "matters occurring before the grand jury" (grand jury matter). Petitioners first argue that a grand jury was in existence prior to the time the client list was used for civil purposes. Respondent argues that no grand jury had considered the transactions or persons in question prior to the time respondent had access to the list. Should that factual question be resolved in respondent's favor, petitioners argue that

tains the statement that there was "confusion as to the commencement of the Grand Jury and the timing of IRS involvement". Petitioners' counsel made numerous allegations about facts which he claimed would clear up any confusion that may have existed as to whether and when grand jury involvement occurred in these circumstances. Additionally, petitioners argued that grand jury materials may exist even where they had not been presented to a grand jury. A reading of the *Abeson* Memorandum Opinion does not reveal whether that theory was considered or whether the facts that petitioners' counsel alleged he could prove were a part of the record or considered.

Accordingly, petitioners were permitted to come forward with respect to the rule 6(e) issue, to present evidence in an attempt to persuade us to vacate our orders to show cause which were made absolute. Additionally, we are presented with a trial on the merits of the question of whether petitioner Salvador Lombardo filed a return for 1977.

[5] The parties and case commentary interchangeably use the terms "information", "material", and "matter" to describe that which may be protected under the secrecy provisions of Fed. R. Crim. P. 6(e). For convenience, we use the phrase "grand jury matter".

the definition of "matters occurring before the grand jury" would also include material or information which a U.S. attorney intends to offer to a grand jury. Petitioners explain that U.S. attorneys are authorized to use the grand jury process, and information becomes grand jury matter when an office of the U.S. attorney decides or intends to use that process. After that point in time, any information gathered, under petitioners' theory, would become grand jury matter even though it had not been formally offered to the grand jury. Respondent argues that grand jury matter only comes into existence after information is presented to an empaneled grand jury. We proceed by finding a factual chronology of this case.

## Chronology of the Berg Case

On December 11, 1974, respondent's Criminal Investigation Division (CID) referred a recommendation that Charles Maxwell Berg (Attorney Berg) be prosecuted for violations of section 7206(2)[6] for 1972 and 1973 for review by the Office of Chief Counsel for the Internal Revenue Service (Counsel). The investigation had been conducted principally by Special Agent Michael Berry (Agent Berry) and focused upon Attorney Berg's alleged preparation of other taxpayers' returns and whether Attorney Berg claimed false and fraudulent deductions regarding same. The report contained the conclusion that Attorney Berg had fabricated deductions for taxpayers in exchange for about 10 percent of the refund that resulted from the deductions. Agent Berry's investigation was administrative and did not involve the grand jury process. Agent Berry's report contained the recommendation, however, that various individuals be brought before the grand jury regarding the false preparation of their returns by Attorney Berg.

Counsel, on October 30, 1975, referred CID's recommendation to the Tax Division of the Department of Justice (DJ) for prosecution. Although there was disagreement amongst reviewers at DJ as to the prospects for a successful prosecution, Attorney Berg's case was forwarded, by a letter dated

---

[6] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the periods under consideration, and Rule references are to the Tax Court Rules of Practice and Procedure.

April 13, 1976, to the U.S. attorney for the Central District of California (USA) with the following recommendation:

Because of problems in this case a decision has not yet been made as to whether or not Mr. Berg should be indicted. The case is being transmitted to you with the request that the witnesses be tested before the grand jury. Final decision as to whether or not Mr. Berg should be prosecuted is left to your discretion.

Assistant U.S. Attorney Jonathan David Rapore (AUSA Rapore) was first assigned to handle Attorney Berg's case. As of August 9, 1976, no final decision had been made by AUSA Rapore as to whether to recommend that Attorney Berg be indicted. During September 1977, AUSA Rapore stated in a memorandum to the file that Attorney Berg should be prosecuted and he also proposed use of the grand jury to develop the case against Attorney Berg. During September 1977, Attorney Berg's case was reassigned from AUSA Rapore to Assistant U.S. Attorney Steven Kramer (AUSA Kramer).

Subsequent to his assignment of the case, AUSA Kramer requested the assistance of an agent of respondent in the handling of Attorney Berg's case. Agent Berry was not available and Special Agent John Reimer (Agent Reimer) was assigned to assist AUSA Kramer. During April 1978, Agent Reimer met with AUSA Kramer to discuss DJ's recommendation regarding the prosecution of Attorney Berg for the 1972 and 1973 years. AUSA Kramer asked Agent Reimer to determine if Attorney Berg continued to prepare "fraudulent" Federal income tax returns for clients. Based upon that inquiry, Agent Reimer went to Internal Revenue Service records and determined that Attorney Berg continued to be a return preparer. After locating records indicating that Attorney Berg had prepared returns for clients' taxable years subsequent to 1973, Agent Reimer obtained (from internal sources) about 50 returns which reflected (in Agent Reimer's opinion) that Attorney Berg continued to prepare returns with inflated deductions for clients' 1974 through 1977 tax years, but mostly for 1976 or 1977.

Based upon the above analysis, Agent Reimer selected about 10 or 15 of Attorney Berg's clients and interviewed them at their homes. Agent Reimer did not serve subpoenas or threaten to serve subpoenas on any of these individuals.[7]

---

[7] Either grand jury subpoenas or administrative summonses under sec. 7602.

Many of the interviewees would not discuss the matter with Agent Reimer and told him to contact Attorney Berg. Agent Reimer put together a summary of his findings and then visited AUSA Kramer to discuss Attorney Berg's case. AUSA Kramer felt that there was potential for a successful prosecution of the more current years and he decided to attempt to obtain authorization to expand the investigation to the 1974 through 1977 years. AUSA Kramer, on February 28, 1979, wrote to DJ for authorization to expand the 1972-73 investigation to include 1974 through 1977. In a June 26, 1979, letter to DJ, AUSA Kramer inquired about the status of the request in his February 28, 1979, letter. In an August 30, 1979, letter AUSA Kramer advised DJ that the USA's office had decided not to prosecute Attorney Berg for the 1972 and 1973 taxable years and that Counsel's office was opposed to extending Attorney Berg's case to the 1974 through 1977 years. At this point, it appears that DJ declined to expand Attorney Berg's investigation to the 1974 through 1977 years. In that same August 30, 1979, letter AUSA Kramer urged the Internal Revenue Service to pursue its investigation of Attorney Berg for the years 1974 through 1978. Thereafter, AUSA Kramer returned the 1972-73 investigation files to respondent.

AUSA Kramer did not issue or cause the issuance of grand jury subpoenas with respect to the investigation of Attorney Berg's 1972 or 1973 tax-related activities. Agent Reimer did not serve grand jury subpoenas or appear before a grand jury regarding Attorney Berg's 1972-73 criminal investigation. Through the end of 1979, no testimony or documents were presented to a grand jury concerning the investigation of Attorney Berg for the 1972-73 taxable years.

Some of the correspondence and memoranda of Agent Reimer used the expression "dismissed before indictment" in referring to the results of the 1972-73 criminal investigation of Attorney Berg. Agent Reimer intended to express that criminal prosecution of Attorney Berg for the 1972 and 1973 tax years had been declined by DJ or AUSA Kramer. AUSA Kramer and Agent Reimer, in the correspondence related to the seeking of authorization from DJ to expand the 1972-73 case to the 1974-77 years, used the expression or terms "extension [or expansion] of the Grand Jury." AUSA Kramer

and Agent Reimer used that language in connection with the request to extend the 1972-73 investigation to later years.

After AUSA Kramer declined the 1972-73 case, Agent Reimer, during November 1979, wrote a report recommending that subsequent years be investigated for criminal prosecution. Agent Reimer's involvement with respondent's criminal investigation of Attorney Berg concluded after November 1979, with the exception that he participated in the execution of a search warrant on the premises of Berg & Allen on September 3, 1981. On December 5, 1979, CID sent a memorandum to the Examination Division requesting that examination of returns prepared by Attorney Berg be discontinued and held in "suspense".

Donald K. Halper (Attorney Halper) was an attorney who was manager of Berg & Allen's tax department from February 1979 through August 1979. Prior to that time, Attorney Halper had been employed as an attorney for the Veterans' Administration and the Internal Revenue Service. Attorney Halper invested in a tax shelter being promoted by Berg & Allen.

During his employment with Berg & Allen, Attorney Halper became concerned about the terms of powers of attorney executed by clients and the practice of Berg & Allen clerical employees endorsing clients' Federal tax refund checks and depositing them in Berg & Allen's bank account. Thereafter, during August 1979, Attorney Halper's employment with Berg & Allen concluded. Attorney Halper went to an Internal Revenue Service office and requested that his tax return be amended to remove the tax shelter promoted by Berg & Allen. Attorney Halper also offered to become an informant to respondent in connection with the activities of Attorney Berg.

Attorney Halper's contact with respondent was voluntary, and he had not received a subpoena or summons during 1979. Attorney Halper's contact with respondent was not brought to AUSA Kramer's attention during his consideration of whether to prosecute Attorney Berg for the 1972 and 1973 tax years. Attorney Halper submitted an Application for Reward for Original Information on or about October 23, 1979, in connection with his assistance to respondent regarding Attorney Berg. Attorney Halper testified before the grand

jury (*infra*) during or after September 1981 regarding Attorney Berg.

Based upon the information developed by Agent Reimer, the investigation of Attorney Berg was assigned to Special Agent Eric Critchfield (Agent Critchfield) on November 30, 1979. Late in 1979, CID requested that all of Berg & Allen's clients' returns under civil audit be forwarded to CID. Special Agent Robert Hessler (Agent Hessler), during February 1980, was also assigned to assist Agent Critchfield with interviews of these clients, and eventually Agent Hessler took over the Attorney Berg investigation. Agent Hessler continued to request tax returns of taxpayers whose returns had been prepared by Attorney Berg and he interviewed Attorney Halper. During June 1980, Agent Hessler requested that he be permitted to recommend that a grand jury be used to investigate Attorney Berg because the clients were unwilling to provide information to Agent Hessler. Agent Hessler's supervisor refused the first request to recommend use of a grand jury investigation regarding Attorney Berg.

By a letter dated May 27, 1981, the office of the USA informed respondent that an investigation of Attorney Berg had uncovered possible violations of 18 U.S.C. (title 18), and requested respondent's joint participation in an investigation (of title 18 and 26 U.S.C. (title 26) violations) of Attorney Berg and his law firm by means of a grand jury. Respondent refused and, instead, requested use of a search warrant to seize Berg & Allen's books and records. The search warrant was approved and issued, and on September 3, 1981, Berg & Allen's books and records were seized. In connection with that seizure, CID obtained the identities of Berg & Allen clients. The names of those clients were, at some point, made into a list. Agent Hessler, during September 1981, became involved in assisting the USA in the grand jury investigation (*infra*) of Attorney Berg under title 18, even though title 26 matters had not yet been approved for a grand jury investigation.

On September 30, 1981, the USA began a grand jury investigation of Attorney Berg. On October 28, 1981, the USA again requested the participation of respondent in a joint title 18 and title 26 investigation of Attorney Berg by means of the grand jury. On December 14, 1981, Counsel recommended to DJ that the criminal tax aspects concerning

Attorney Berg be approved. DJ approved that request during February 1982.

During part of the time that respondent's criminal investigators were considering and recommending criminal prosecution of Attorney Berg, respondent's auditors were examining returns of Attorney Berg's clients on a routine and normal basis. Those audits had not been referred by CID or through a special program of respondent. No special projects that focused on Attorney Berg were begun prior to October 1980.

Revenue Agent John Cossentine (Auditor Cossentine) and Revenue Agent Ted Meyer (Auditor Meyer) were separately auditing returns of Attorney Berg's clients during the early part of 1979. Those returns had been assigned to Auditors Cossentine and Meyer through normal procedures or regular channels and not in connection with any criminal investigation of Attorney Berg. Eventually, by January 1980, Auditor Cossentine had about five of Attorney Berg's clients' returns for examination. During the year 1979, Auditor Meyer had been assigned about 10 of these returns. At some point during 1979, Attorney Halper called the office of the Internal Revenue Service and spoke to Auditor Cossentine concerning the audit of Attorney Berg's clients' returns and the activities of Attorney Berg. Attorney Halper was considered an informant concerning Attorney Berg and sought an informant's reward from respondent. Up to this time, neither Auditor Cossentine nor Auditor Meyer was in contact with CID concerning Attorney Berg, and they did not contact CID in advance of conversations with Attorney Halper about Attorney Berg. Subsequent to receiving informant type information from Attorney Halper, during October and December 1979, Auditors Cossentine and Meyer met with and advised a special agent of the information received from Attorney Halper. Those meetings were requested by the auditors. On December 17, 1979, Attorney Halper was interviewed by two special agents concerning Halper's relationship to Attorney Berg and his law firm.

By October 1980, a fully coordinated examination effort to audit returns of clients who had their Federal income tax returns prepared by Berg & Allen was being conducted within respondent's Examination Division. Plans for the project were begun sometime after a January 11, 1980,

memorandum from the Chief of the Examination Division notifying the Examination Division that audits of returns prepared by Attorney Berg could be resumed. By July 1980, the Examination Division had about 150 returns under examination. Under the coordinated procedures, a group of tax auditors was assigned solely for the purpose of auditing returns of Berg & Allen clients. Additionally, refunds claimed for Berg & Allen's clients' 1980 tax year were frozen on a national level. The returns of partnerships which were part of the Berg & Allen refund program were also coordinated with this program.

The returns for this coordinated audit program were obtained by the following methods: (1) The most common method was to secure the return for audit by means of a "preparer inventory listing". These listings permitted respondent's auditors access to search for all returns filed by clients of a particular return preparer. (2) Some returns were secured through the "Questionable Preparer Program", which was a service center screening program to identify preparers whose clients generally had overinflated deductions or some other problem. (3) Some of the returns were secured through the "DIF system", under which returns are scored for audit depending on the return's score variation from established statistical norms. (4) Notification to service centers, other than in California, of the Berg & Allen coordinated project also provided some returns for audit. (5) Work on returns had been suspended late in 1979 and the Examination Division sent Attorney Berg's clients' returns to CID. After January 1980, the Examination Division was permitted to resume examining Attorney Berg's clients' returns and CID sent back those returns submitted by the Examination Division and additional returns of Attorney Berg's clients which had been secured by CID. The returns received from CID could have been identified by the Examination Division on the preparer inventory listing and were received by the Examination Division prior to the September 1981 seizure of Attorney Berg's records which gave rise to the so-called client list.

The coordinated program did not have possession or use of a list of clients of Berg & Allen which had been secured by CID in connection with the seizure of Berg & Allen's records during September 1981. Auditors involved with the coordinated program occasionally would be required to request a

return from CID. In those instances, the return was sought from CID after auditors discovered a specific Attorney Berg client in the preparer inventory listing. The supervisor of the coordinated audit program worked with Agent Hessler in connection with the project. In that relationship, Agent Hessler was provided with information obtained during the conduct of the civil audits of Attorney Berg's clients for use in the criminal case. In that relationship, however, the supervisor did not receive information, other than returns which were usually requested by the auditors and the multiple filer list, from Agent Hessler or CID. It was respondent's policy that information developed by CID was not provided to the Examination Division.

The multiple filer list was prepared for CID from respondent's computer, and it reflected situations where more than one refund check went to the same address or addressee. On occasion auditors would use the multiple filer list from CID because it identified the location of the return and preparer. Additionally, the multiple filer list was generated by the local service center and could be more quickly generated and obtained than the preparer inventory list, which was a national compilation and took longer to generate and obtain.

Based upon the codes on the returns of petitioners in these cases, they were selected for examination for the following reasons: (1) Regular classification by service center employees; (2) received a high DIF score; (3) relationship to a tax shelter examination; (4) related to a high DIF scored return; (5) related to a preparer project. None of the returns of petitioners in these cases were initially selected by CID.

*Petitioner Lombardo's 1977 Return*

Petitioner Salvador A. Lombardo first met Attorney Berg during 1978 while Mr. Lombardo was installing two telephones for Attorney Berg. Attorney Berg inquired about Mr. Lombardo's income and suggested that Mr. Lombardo "should get involved in a tax shelter". Mr. Lombardo agreed and engaged Attorney Berg to prepare his 1977 income tax return, and Mr. Lombardo knew that Attorney Berg was filing Mr. Lombardo's income tax returns. On February 24, 1978, Mr. Lombardo signed a power of attorney (Form 2848) authorizing Attorney Berg to represent him before the

Internal Revenue Service for Mr. Lombardo's 1975, 1976, 1977, and 1978 tax years.[8] The power of attorney is the standard form authorizing representation of a taxpayer and also lists specific authority to receive refund checks, waive restrictions on assessment and collection, consent to extend the period for assessment, execute a closing agreement under section 7121, and delegate the authority to another representative. In addition to the specific authority printed on the form, Attorney Berg was specifically authorized, by a handwritten statement, to endorse and collect refund checks for Mr. Lombardo.

Mr. Lombardo's 1977 Federal income tax return was filed with the Internal Revenue Service on or before April 15, 1978. Attorney Berg signed or executed the return on behalf of Mr. Lombardo, as reflected by initials next to what purports to be Mr. Lombardo's signature. Mr. Lombardo did not sign the return. The power of attorney signed by Mr. Lombardo was attached to the 1977 return. Mr. Lombardo's 1977 return reflected the address of "C/O Berg, P O Box 2000, BEVERLY HILLS CALIF 90213", which is Attorney Berg's office address. Mr. Lombardo did not file any original 1977 Federal income tax return other than the one filed on his behalf by Attorney Berg. In addition to the 1977 return, Attorney Berg filed amended returns for Mr. Lombardo's 1975 and 1976 taxable years.

---

[8] Petitioners objected to the receipt of Exhibit 123 for identification (along with other similar exhibits) into evidence. This exhibit is the 1977 Federal income tax return filed for petitioner Lombardo. The related exhibits are also income tax returns for the other petitioners in this consolidated proceeding. The objection was tactical in that petitioners argued that they never saw the return before the trial because the returns were filed by Attorney Berg as their purported agent.

After some discussion on the record, the parties stipulated that, as part of the series of exhibits, Exhibit 123 could be received for the limited purpose of specific witnesses' testimony interpreting charge-out sheets which had been attached to various of petitioners' returns by respondent's employees after the returns had been filed. Both parties, on brief, have relied upon Exhibit 123 for proposed findings of fact concerning the issue involving petitioner Lombardo's filing of a 1977 return. We treat the parties' approach on brief as an implicit agreement that Exhibit 123 is to be considered part of the record without limitation upon its use. We note that petitioner Lombardo would have preemptively failed to meet his burden of proof on the issue concerning the filing of the 1977 return, without the return's being in evidence for all purposes. We also note that petitioner Lombardo's argument regarding the 1977 return would have been more difficult to comprehend without the ability to reference Exhibit 123. Finally, we note that the outcome of this issue would be the same whether Exhibit 123 was received for all purposes or not. In either event, petitioner Lombardo failed to show that the return filed was not his or that it was unauthorized.

## Discussion

### Petitioner Lombardo's 1977 Income Tax Return

Petitioner Lombardo argues that he did not file a 1977 Federal income tax return. Mr. Lombardo does not, however, advise us of the effect that his nonfiling would have on his case. We presume that his failure to file a 1977 return would in some way[9] reduce or obviate the income tax deficiency and additions to tax determined by respondent. More specifically, petitioner Lombardo argues that Attorney Berg was not authorized to sign his name on the 1977 income tax return. Respondent argues that petitioner Lombardo authorized Attorney Berg to represent him and to file various returns in order to generate an income tax refund from several taxable years, including 1977. Further, respondent argues that petitioner, at the time of the filing of the 1977 return, intended to file a return and that after having received the benefit of refunds and the passage of 14 years he should not now be permitted to disavow the filing of his 1977 return. We agree with respondent.

Section 6061 provides that "any return * * * required to be made under any provision of the internal revenue laws or regulations shall be signed in accordance with forms or regulations prescribed by the Secretary." Section 6064 provides that the "fact that an individual's name is signed to a return * * * shall be prima facie evidence for all purposes that the return * * * was actually signed by him."

Section 1.6012-1(a)(5), Income Tax Regs., permits returns to be made by an agent with the permission of respondent. Whenever a return is made by an agent, it must be accompanied by a power of attorney and/or Form 2848. Although taxpayers are required to request permission to have an agent execute and file a return, obviously respondent could waive that requirement. Also, section 31.6011(a)-7(a), Proced. & Admin. Regs., involving employment tax, provides that a "return may be made by an agent in the name of the person required to make the return if an acceptable power of attorney is filed with the internal revenue office with which such person is required to file his returns".

---

[9] Without the deductions claimed on his behalf by Attorney Berg, petitioner Lombardo might have had sufficient prepayment credits which would result in a smaller deficiency or no deficiency.

Petitioner Lombardo agreed to involvement in Attorney Berg's tax refund idea and engaged Attorney Berg to prepare his 1977 and other income tax returns. Mr. Lombardo knew that Attorney Berg was filing Mr. Lombardo's income tax returns. Mr. Lombardo signed a power of attorney (Form 2848) authorizing Attorney Berg, as his attorney in fact, to represent Mr. Lombardo before the Internal Revenue Service for the 1975, 1976, 1977, and 1978 tax years. The power of attorney attached to the return is the standard form for representation listing specific authority to receive refund checks, waive restrictions on assessment and collection, consent to extend the period for assessment, execute a closing agreement under section 7121, and delegate the authority to another representative. In addition to the specific authority printed on the form, Attorney Berg was specifically authorized by a handwritten statement to endorse and collect refund checks for Mr. Lombardo.

Petitioner Lombardo's 1977 return complied with the statutory and regulatory requirements for an agent filing an income tax return on behalf of a taxpayer. Although Mr. Lombardo might not have known what his agent reported to respondent, he received the benefit of that agency (refunds)[10] and should not now be permitted to withdraw the authorization which he had freely given because it has now become disadvantageous. The passage of time (more than 10 years) makes this attempt at withdrawal even more tenuous.

The situation here is analogous to that in *United States v. Wynshaw,* 697 F.2d 85, 87 (2d Cir. 1983), where the taxpayer wife admitted in a petition to this Court that she joined in a joint return. Subsequently, she attempted to raise the affirmative defense that she had not placed her signature on or authorized the signing of her name on the subject return. The Court held that the taxpayer wife was precluded from raising the defense because her representations could have been expected to cause the Commissioner's reliance and because the Commissioner acted relying on the representa-

---

[10] It has already been decided in the test case that Berg & Allen clients should be considered to have received refund checks in care of Berg & Allen and negotiated by Berg & Allen. *Abeson v. Commissioner,* T.C. Memo. 1990-190, affd. without published opinion sub nom. *Rivera v. Commissioner,* 959 F.2d 241 (9th Cir. 1992). By subsequent orders to show cause which were made absolute, petitioners in these cases (and others) were held to have not shown cause why their cases would end in a different result. Accordingly, for purposes of this case we accept that Mr. Lombardo received the benefit of the refunds claimed on his behalf by Attorney Berg.

tion. Here petitioner willingly and knowingly allowed his agent to file returns on his behalf. Respondent relied upon that authorization. We hold that petitioner Lombardo has not carried his burden of showing that the filing of his return and affixing of his signature by Attorney Berg was not authorized.

Petitioner Lombardo equates the situation here with those involving unsigned returns. See, e.g., *Richardson v. Commissioner,* 72 T.C. 818, 823-824 (1979). In the cases relied upon by petitioner Lombardo, returns were submitted to the Internal Revenue Service without the signatures of the taxpayers or their agent(s). In those situations, the Court held, for purposes of the commencement of the period for assessment, that no return had been filed. Those cases are not analogous and are inapposite to the circumstances of this case.

We find the case of *Miller v. Commissioner,* 237 F.2d 830, 837 (5th Cir. 1956), revg. on this issue T.C. Memo. 1955-112, to be more on point. In that case, a taxpayer's spouse signed his name to a return. The Court of Appeals for the Fifth Circuit, in holding that a return had been filed for purposes of the commencement of the assessment period, stated:

> Where, as here, a return complete in form, signed in the taxpayer's name by one purporting to have authority and who actually had such authority, was filed, we find no basis for holding that this was no such return as would commence the running of the statute of limitations. * * *

In *Booher v. Commissioner,* 28 T.C. 817, 824-825 (1957) (Court reviewed), we agreed with the view of the Court of Appeals.

We accordingly hold that petitioner Lombardo timely filed a 1977 return.

*Grand Jury Issue*

At the heart of petitioners' argument is the premise that their identities were obtained from grand jury matter without a proper order under rule 6(e) of the Federal Rules of Criminal Procedure. We have found that petitioners' returns were not identified for purposes of civil examination from the names or list of names secured in connection with the seizure of Attorney Berg's records during September 1981. We have also found that matters concerning Attorney Berg had not been presented to a grand jury prior to September 1981.

Those two factual findings obviate the possibility that the source of petitioners' civil audits was matters which actually had been presented to a grand jury. Although petitioners have focused principally upon the client list from the records seizure, they also argue that sometime prior to the September 1981 seizure or grand jury activity, information concerning Attorney Berg and his clients had become grand jury matter. Petitioners contend that the USA had the authority and intended to present Attorney Berg's 1972-73 case to the grand jury. Because U.S. attorneys have relatively unfettered authority to submit a matter to a grand jury, petitioners argue that any information gathered in anticipation of a grand jury submission, per se, becomes grand jury matter. This is a novel position without direct precedent.

We address the question of whether the pre-grand jury investigative materials concerning Attorney Berg had become grand jury matter within the meaning of rule 6(e). Prior to September 1981 some limited[11] amount of the materials gathered by CID during 1976 up to 1981 found its way from the office of the USA and/or respondent's CID office to the Examination Division and became part of the coordinated audit program materials concerning Attorney Berg's clients. If[12] the returns and/or identities of taxpayers were grand jury matter or derived therefrom and were used for civil purposes, petitioners argue that respondent would have been in violation of rule 6(e) and should be sanctioned. For purposes of our consideration we assume that Attorney Berg's records and/or the identities of some or all of his clients were eventually presented to the grand jury beginning sometime during or after September 1981.

Rule 6(e)(2) provides for secrecy of the grand jury proceedings, as follows:

A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the

---

[11] Only one witness indicated that pre-1981 information gathered in connection with the criminal investigative efforts was forwarded to the civil examiners. That witness revealed that some returns secured by CID may have been sent to the Examination Division after CID advised that civil audits could be resumed. There is no direct evidence that those returns provided the identity of a taxpayer who was subseuently audited.

[12] We make this assumption here because of our understanding that numerous cases involving taxpayers who were involved in Berg & Allen transactions are currently pending in this Court. These consolidated cases are being treated as test cases. To the extent that any of the taxpayers not in these consolidated cases may have been identified for purposes of civil audit from the seized records or client list, the result would be the same.

government, or any person to whom disclosure is made under paragraph (3)(A)(ii) of this subdivision shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. No obligation of secrecy may be imposed on any person except in accordance with this rule. A knowing violation of Rule 6 may be punished as a contempt of court.

Although this Court does not have subject matter jurisdiction over the disclosure of grand jury matter under rule 6(e), we have jurisdiction to consider the effect that violations of rule 6(e) may have upon civil tax litigation before this Court. *Kluger v. Commissioner*, 83 T.C. 309, 314-321 (1984). Petitioners assert that the notices of deficiency are tainted because they are based upon grand jury matter which was improperly disclosed for use in civil tax examinations. Petitioners seek sanctions, including invalidation of the notices of deficiency, suppression of evidence, and shifting of the burden of proof. These matters relate not to the question of whether we have jurisdiction but rather to evidentiary and procedural matters already within our jurisdiction. Accordingly, it is appropriate for this Court to consider the effect, if any, that the alleged violations of rule 6(e) have upon these consolidated cases.

It is a well-established principle that grand jury matter should generally not be disclosed and that the grand jury system requires secrecy. *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218-219 (1979).[13] It is also well established that grand jury matter should not be disclosed to the Internal Revenue Service for use in determining or litigating civil tax liability without a showing of particularized need. *United States v. Baggot*, 463 U.S. 476 (1983); *United States v. Sells Engineering, Inc.*, 463 U.S. 418 (1983). Once information becomes grand jury matter, disclosure of it is subject to the requirements of rule 6(e).

---

[13] Maintaining the confidentiality of grand jury proceedings protects several important interests of the government and of private citizens. First, if preindictment proceedings were conducted publicly, individuals who learned of their possible indictment might flee the jurisdiction or attempt to tamper with the grand jurors or witnesses appearing before them. Persons with information about crimes would be less willing to appear voluntarily and to speak fully and frankly, knowing that the individuals about whom they testify would be aware of that testimony. The rule of secrecy avoids injury to the reputation of those persons accused of crimes whom the grand jury does not indict. Finally, it encourages the grand jurors to investigate suspected crimes without inhibition and to engage in unrestricted deliberations. [*In re Grand Jury Investigation*, 610 F.2d 202, 213 (5th Cir. 1980); citations omitted.]

The question posed in this case focuses upon the meaning of the phrase "matters occurring before the grand jury" within the context of rule 6(e). If something has not been presented to a grand jury and cannot otherwise be defined as grand jury matter,[14] then it is not subject to the grand jury secrecy requirements. Such a document or information could be used by respondent without concern for the requirements of rule 6(e).

There is no question that testimony before a grand jury is a "[matter] occurring before the grand jury." *Douglas Oil Co. v. Petrol Stops Northwest, supra.* "Rule 6(e) applies not only to information drawn from transcripts of grand jury proceedings, but also to anything which may reveal what occurred before the grand jury." *In re Grand Jury Matter,* 682 F.2d 61, 63 (3d Cir. 1982) (*Catania*); *In re Grand Jury Investigation,* 610 F.2d 202, 216-217 (5th Cir. 1980). With respect to documents presented to a grand jury, although they may become grand jury matter, courts generally hold that documents that exist independently of the grand jury may be disclosed. *SEC v. Dresser Industries, Inc.,* 628 F.2d 1368, 1382-1383 (D.C. Cir. 1980), cert. denied 449 U.S. 993 (1980). Disclosure, however, must be preceded by a showing of lawful entitlement and particularized need. *United States v. Sells Engineering, Inc., supra.*

As a matter of law, petitioners ask us to categorize as grand jury matter any documents or information gathered by or on behalf of a U.S. attorney who is authorized and intends to use the grand jury to prosecute. In support of their position, petitioners rely heavily on *United States v. Williams,* 504 U.S. ____, 112 S. Ct. 1735 (1992). That case does not support petitioners' position and we were unable to find any cases supporting petitioners' position. The Supreme Court in *United States v. Williams, supra,* considered an issue involving the grand jury process. The substantive question in that case was whether prosecutors had a duty to present exculpatory evidence to a grand jury. In that connection, the *Williams* opinion reflects a recognition that the grand jury is an entity separate from the courts, and as a consequence some

---

[14] The memorialized interview of a witness preliminary to testimony before a grand jury has been held to constitute grand jury material. See, e.g., *In re Grand Jury Matter,* 697 F.2d 511, 512-513 (3d Cir. 1982). Accordingly, we must also focus upon matters in anticipation of a grand jury and whether they may reveal what eventually occurred before the grand jury.

unfettered authority defaults to U.S. attorneys in the grand jury's ex parte environment. Following in that vein, the opinion is concerned with the potential for abuse of that authority. From these concepts, petitioners extrapolate that the U.S. attorneys' relatively unfettered ability to use the grand jury translates into the concept that anything gathered by Government prosecutors may be presented to a grand jury at the whim of the prosecutor and, hence, automatically becomes subject to the secrecy provision of rule 6(e). Petitioners argue this is so even where the information gathered is not presented to a grand jury.

Petitioners' approach or proposed definition of grand jury matter does not comport with traditional concepts and is too pervasive to comport with established definitions of grand jury matter. It is axiomatic that if something was intended for use before a grand jury, it could, at some point, become grand jury matter. Even if it were to become grand jury matter, i.e., a matter presented to the grand jury, it may still be disclosed upon a showing that it did not reveal the content of the grand jury proceeding. That is the standard for rule 6(e)—whether the content of the grand jury process is revealed—and not, as petitioners suggest, whether the information has the potential to become grand jury matter.

Rule 6(e) has been defined as being applicable to "anything which may reveal what occurred before the grand jury." *Standley v. Department of Justice,* 835 F.2d 216, 218 (9th Cir. 1987); *Catania, supra* at 63. The rule 6(e) secrecy policy is to "protect from disclosure only the essence of what takes place in the grand jury room, in order to preserve the freedom and integrity of the deliberative process." *In re Grand Jury Investigation,* 630 F.2d 996, 1000 (3d Cir. 1980), cert. denied 449 U.S. 1081 (1981). Accordingly, grand jury review of a document or information does not automatically convert it into a "[matter] occurring before the grand jury" for purposes of rule 6(e). "Documents such as * * * business records * * * are created for purposes independent of grand jury investigations, and such records may have legitimate uses unrelated to the substance of the grand jury proceedings." *In re Grand Jury Investigation, supra* at 1000; see also *Blalock v. United States,* 844 F.2d 1546, 1551 (11th Cir. 1988). The standard for delineating whether rule 6(e) prohibitions of disclosure are applicable involves the question of whether

such documents or information would reveal the content of the grand jury proceeding.

The case law, however, leaves us with a somewhat confusing paradigm. Rule 6(e), in part, provides that certain individuals "shall not disclose matters occurring before the grand jury". This verbatim statement has been extended by judicial interpretation to include materials obtained prior to grand jury involvement. This is so if such materials (which are not presented to the grand jury) would reveal the contents of the grand jury proceeding. An example of this type of material would be a recorded interview of a potential grand jury witness. This extension of the definition of grand jury matter creates the potential for a large and nebulous universe of things which may not have been presented to a grand jury, but which could be classified as grand jury matter. The identities of potential grand jury witnesses (such as Attorney Berg's clients) could possibly reveal the content of a potential grand jury proceeding.

There is an absence of a bright line standard for when investigative materials become grand jury matter. Accordingly, consideration of several cases bearing on these questions is instructive. In one such case, the Circuit Court, *Catania,* 682 F.2d 61 (3d Cir. 1982), affirmed the District Court's holding that certain investigative materials developed by the Federal Bureau of Investigation (FBI) were not grand jury matter. In that case, the U.S. attorney was seeking a rule 6(e) order to disclose grand jury matter to a State prosecutor. In the course of seeking that order, it was brought to light that the Federal prosecutor had already provided certain FBI investigative materials and information to the State prosecutor. The materials included tape recordings and transcripts of consensually monitored conversations, certain FBI forms ("302's"), documents obtained without grand jury subpoena, a prosecution memorandum summarizing the information compiled by the FBI, and draft indictments prepared by the U.S. attorney.

It was held in *Catania* that the materials disclosed to the State prosecutors by the U.S. attorney were from a source independent of the grand jury proceeding, such as a prior Government investigation, and the disclosure did not violate rule 6(e). *Catania, supra* at 64; see also *In re Grand Jury Investigation,* 610 F.2d 202, 217 (5th Cir. 1980); *United*

*States v. Johns*, 688 F. Supp. 1017, 1023 (E.D. Pa. 1988). Accordingly, even though the information developed by the Government investigatory agency was developed with an eye toward ultimate use in a grand jury proceeding, it does not become protected by rule 6(e) if it exists separately and independently of the grand jury process. *DiLeo v. Commissioner*, 959 F.2d 16 (2d Cir. 1992), affg. 96 T.C. 858 (1991); *Catania, supra* at 64; *United States v. Interstate Dress Carriers, Inc.*, 280 F.2d 52, 54 (2d Cir. 1960).

The facts in *Catania* are strikingly similar to those under consideration. *Catania* and the cases herein involve Federal executive branch investigatory agents who were working with a U.S. attorney where use of a grand jury was either planned or in progress. The facts in *Catania* are more favorable to petitioners' argument than the facts in the instant cases because in *Catania* testimony had already been presented to the grand jury. In that setting, the District and Circuit Courts concluded that disclosure of the investigative materials, even though developed for use before the grand jury, did not violate rule 6(e). In other words, the disclosure did not reveal what occurred before the grand jury.

Additionally, concerning the draft indictment prepared by the U.S. attorney, the Circuit Court, in a footnote in *Catania*, stated that "Although these were prepared after the grand jury deliberations began and might be based on knowledge of the grand jury proceeding, they do not reveal any grand jury information on which they might be based." *Catania*, 682 F.2d at 64 n.4.

In another case, *In re Grand Jury Proceedings*, 486 F.2d 85 (3d Cir. 1973), a subject of a grand jury inquiry had been subpoenaed to provide handwriting exemplars, fingerprints, and a mug shot. In an attempt to resist complying and in connection with a contempt hearing, the subpoenaed witness sought disclosure of certain information. The Government was required, prior to enforcement of the subpoena, to submit an affidavit to the court to make a preliminary showing of the relevance of the handwriting exemplars, fingerprints, and mug shot. The court held that the Federal prosecutor's affidavit was not a matter occurring before a grand jury and could be disclosed to the witness. *In re Grand Jury Proceedings, supra* at 93.

In another case considered by the Court of Appeals for the Third Circuit, it was held that certain invoices and auditor's analyses were grand jury matter because they revealed the contents of the grand jury proceeding no less than the transcript of witnesses' testimony before the grand jury. *In re Grand Jury Matter*, 697 F.2d 511 (3d Cir. 1982). After the subject of the Federal grand jury in that case had pled guilty to some of the counts in the indictment, a State revenue department sought to obtain access to "all of the grand jury materials pertinent to its investigation." *In re Grand Jury Matter, supra* at 512. The trial court refused disclosure of transcripts of testimony and records of pre-grand jury witness interviews, but ordered disclosure of certain materials considered by the grand jury, including invoices and an auditor's analyses of books and records. In reversing the trial court, the appellate court noted that the auditor's analyses contained the auditor's conclusion about the legitimacy of certain expenses and revealed the contents of proceeding before the grand jury. More importantly, the appellate court noted that the analyses did not exist independently of the grand jury proceeding and had been prepared for and presented to the grand jury. *In re Grand Jury Matter, supra* at 513.

In *Anaya v. United States*, 815 F.2d 1373, 1379 (10th Cir. 1987), it was held that the FBI's investigative materials which were examined by the Internal Revenue Service during the pendency of a grand jury proceeding were not protected by rule 6(e) because the materials had not been presented to the grand jury. The court reasoned that "Rule 6(e) is not intended to deter the government from a legitimate investigation, so long as that investigation does not reveal what took place in the grand jury room." *Anaya v. United States, supra* at 1379. Because the FBI's investigation was both preliminary and parallel to the grand jury's consideration, the appellant in that case argued that "the material was so closely related to what *was* presented that it must fall within the shadow of [rule] 6(e). Citing *SEC v. Dresser Industries, Inc.*, 628 F.2d 1368 (D.C. Cir.), cert. denied 449 U.S. 993 * * * (1980)". *Anaya v. United States, supra* at 1379. In response, the court noted that several of the cases cited by the appellant involved materials which had been presented to a grand jury. The court also indicated that cer-

tain information might not reveal the contents before the grand jury, but it was the fact that the grand jury was considering the information which was protected by rule 6(e). Finally, the court held that the Internal Revenue Service was in pursuit of a legitimate investigation and disclosure by the FBI of its investigative material without disclosing what had been submitted to the grand jury was not improper. *Anaya v. United States, supra* at 1380.

*SEC v. Dresser Industries, Inc., supra,* concerns grand jury secrecy in the context of a parallel simultaneous securities investigation by an administrative agency and a grand jury. In defending against the enforcement of a subpoena issued by the administrative agency, the subpoenaed witness argued that enforcement of the subpoena might infringe on the independent role of an ongoing grand jury. The agency and the grand jury were both seeking the witness' records, which had been created for business purposes independent of the grand jury's existence. In enforcing the administrative agency's subpoena, the court reasoned that there was no inherent harm caused by submission of the same records to the agency and the grand jury, so long as the subject matter of the grand jury was not revealed to the agency receiving the records. *Id.* at 1383. If "the grand jury proceedings are genuinely secret, other agencies and courts will not know the subject matter of the grand jury investigation and thus will not be able to determine whether their own inquiry would overlap that of the grand jury." *Id.*

The circumstances in *SEC v. Dresser Industries, Inc., supra,* are similar to those in the cases under consideration. If respondent's agents had obtained information from Attorney Berg's records, including the identities of his clients, that, in itself, does not reveal the content of the subsequent grand jury proceeding. Indeed, the grand jury proceeding in this case did not occur until a substantial time after any possible disclosure of Attorney Berg's records to the civil tax examiners.

Petitioners rely heavily on two cases which involved the release of the identities of potential grand jury witnesses: *In re Grand Jury Investigation,* 610 F.2d 202 (5th Cir. 1980) (*Lance*), and *In re Grand Jury Proceedings,* 914 F.2d 1372 (9th Cir. 1990) (*Lahey*). *Lance* involves a witness' motion to cause sanctions for release of grand jury matter to the news

media. In initially deciding whether there had been disclosure of "matters occurring before the grand jury", the court stated that it construed the rule 6(e) secrecy provisions as extending to "matters which will occur, such as statements which reveal the identity of persons who will be called to testify". *Lance, supra* at 217. The court also stated that information obtained from a source independent of the grand jury proceeding does not violate the grand jury proceeding. *Id.* at 217. That case involved an ongoing grand jury and contemporaneous leaks to the news media.

*Lahey* involved the appeal by a grand jury witness who had been held in civil contempt for refusing to testify. The Court of Appeals for the Ninth Circuit, in affirming the District Court, discussed the question of whether the identities of grand jury witnesses are "matters occurring before a grand jury". The refusing witness, who was incarcerated, asserted, among other defenses, that the manner in which the Government requested and/or facilitated his testimony alerted other prisoners to his status as a potential grand jury witness. The refusing witness thought that disclosure of his identity to the other prisoners would endanger his life or safety.

The refusing witness' defense rested on the assumption that if the public discovers the identity of a grand jury witness, then the secrecy of the grand jury process has been compromised. In rejecting that position, the Circuit Court noted that although the Government is not entitled to publish the identities of prospective or former grand jury witnesses (citing *United States v. Dozier,* 672 F.2d 531, 544-545 (5th Cir. 1982), cert. denied 459 U.S. 943 (1982)), the appropriate judicial reaction to such a disclosure would be a contempt citation for the secrecy violation, not the release of the witness. *Lahey, supra* at 1374-1375. Again, as in *Lance, Lahey* involves a situation where a court considered the claim of a prospective witness of a contemporaneous and ongoing grand jury investigation.

*Lance* and *Lahey* do not stand for the principle that the disclosure of the identity of a potential grand jury witness several years prior to the testimony of that witness is in violation of rule 6(e). The disclosure must reveal the content of the grand jury proceeding. Here, Attorney Berg had hundreds of clients and there is only a possibility that a few of them were identified by means of the investigation conducted

by respondent's agents on behalf of the USA. If that identification took place, however, it was several years prior to any grand jury presentment. Additionally, there has been no showing that any of the petitioners in these consolidated cases or any of Attorney Berg's other clients actually testified before the 1981 grand jury. The circumstances here are substantially remote and distinguishable from those described in *Lance* and *Lahey*.

Even with the benefit of hindsight, more than 10 years after the grand jury considered whether to indict Attorney Berg, we are unable to conclude that petitioners' identities would have revealed the content of the 1981 grand jury proceeding. Petitioners did not show that any of them testified before the grand jury. Even if they had testified, we fail to see how the disclosure of their identities for purposes of civil tax examination, substantially prior in time to any grand jury proceeding, would reveal anything about or have any effect on the grand jury process. The identities of Attorney Berg's clients were available to respondent's agents in the normal course of business and existed independently of the grand jury process.

Petitioners' argument, from both a factual and legal perspective is, at best, a tenuous [15] one. Factually, the only information that could be in this category would have been developed by the criminal investigators and/or USA during their pre-September 1981 involvement in Attorney Berg's case. The record here supports a finding that some returns secured by CID before September 1981 were sent to the civil

---

[15] We note that at a preliminary hearing petitioners, through their counsel, John Harrison Wegge, argued that there was grand jury involvement concerning Attorney Berg prior to 1981. Based upon those arguments, petitioners claimed that respondent's determinations were tainted. In making these allegations petitioners' counsel stated that he was prepared to offer evidence in support of his arguments. Relying upon these statements, petitioners were permitted to make a showing as to why the orders to show cause which had been made absolute should be vacated.

At trial, petitioners did not advance any probative evidence in support of their position other than the documents with words which could, to a limited degree, be interpreted to indicate that there may have been pre-1981 grand jury activity. Petitioners' counsel used these documents as a "smokescreen" to deflect attention from the testimony of credible witnesses who unconditionally testified that the matter had not been presented to a grand jury. Petitioners' counsel was quick to assert that witnesses and even Government counsel were not truthful, but did not come forward with proof to support his assertions.

We also note that although Attorney Wegge has represented numerous of the taxpayers involved in the Berg & Allen tax matter, he did not bring forward one witness to testify that he or she had appeared before a grand jury concerning Attorney Berg prior to 1981. This would have been a simple and conclusive way to support his assertions, rather than by making unsupported accusations that Government counsel and witnesses were lying.

auditors. Some of those returns may have been for people considered by Agent Reimer in response to questions from AUSA Kramer regarding the proposed prosecution for the 1972 and 1973 years. The chance that one of those returns was the sole source of the identity of a taxpayer is remote and has not been shown in this record.

Petitioners also placed great emphasis on the terminology used in correspondence and memoranda by employees of respondent and attorneys of the DJ's and USA's offices. The terminology included: "dismissed before indictment" and "extension" or "expansion" of the grand jury. Petitioners contend that the above-quoted terminology proves the existence of the pre-1981 presentment of Attorney Berg's case to a grand jury. Although certain terminology was unartfully used and may be subject to misinterpretation,[16] the record does not support petitioners' contention that Attorney Berg's case had been presented to a grand jury prior to 1981. Individuals who had used the referenced terminology testified and were subjected to cross-examination. Their testimony was credible and fully supports the finding that Attorney Berg's case had not been presented to a grand jury prior to 1981.

In view of the foregoing, we hold that petitioners have not shown, either factually or as a matter of law, that respondent's determination was based upon a matter before the grand jury and subject to the secrecy requirements of rule 6(e). It is therefore unnecessary to consider petitioners' request for sanctions.

---

[16] On brief, petitioners point out that the Court of Appeals for the Ninth Circuit in its unpublished opinion referenced possible grand jury involvement as follows:

While the tax court's opinion does not specifically address the existence of the 1978/79 grand jury investigation, it does strongly imply the existence of such an investigation. See Abeson, p90,190 PM Memo TC at 888 (finding that [in] February 1979, the U.S. Attorney requested authorization to extend the scope of a grand jury investigation, thus implying the existence of a grand jury investigation as early as 1979). [Rivera v. Commissioner, 959 F.2d 241, 1992 U.S. App. LEXIS 6058 at *15 (9th Cir. 1992), affg. without published opinion Abeson v. Commissioner, T.C. Memo. 1990-190.]

Although the referenced language may denote or connote the existence of a grand jury proceeding, the evidence in this record shows that no grand jury proceeding with respect to Attorney Berg occurred prior to September 1981. Petitioners, in their brief, inappropriately argue as though the existence of a grand jury during 1979 had been found by the three-judge Circuit Court panel.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*