T.C. Memo. 1997-432

UNITED STATES TAX COURT

PELLE KARLSSON AND EVELYN T. KARLSSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 16542-86, 45989-86.    Filed September 23, 1997.

<u>Mark D. Pastor</u> and <u>Robert T. Leonard</u>, for petitioners.

<u>Elizabeth Girafalco Chirich</u>, <u>Susan K. Greene</u>, <u>Karen M. Tate</u>, and <u>Marion S. Friedman</u>, for respondent.

MEMORANDUM OPINION

SWIFT, <u>Judge</u>:  This matter is before us on our order to show cause why resolution of the issues in these consolidated cases should not be controlled by resolution of these same issues in our test case opinion in <u>Krause v. Commissioner</u>, 99 T.C. 132

(1992), affd. sub nom. <u>Hildebrand v. Commissioner</u>, 28 F.3d 1024 (10th Cir. 1994).  <u>Krause</u> involved limited partnership investments related to and similar to those in which petitioners herein invested and which are at issue in these cases.

Respondent determined deficiencies, increased interest, and additions to tax in petitioners' Federal income taxes as follows:

| | | | | Increased Interest and Additions to Tax | | | |
|---|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6621(c) | Sec. 6651(a)(1) | Sec. 6653(a)/ 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 | Sec. 6661 |
| 1979 | $59,740 | * | $14,935 | $2,987 | -- | -- | -- |
| 1980 | 64,707 | * | 6,471 | 3,235 | -- | -- | -- |
| 1981 | 70,012 | * | 10,502 | 3,501 | ** | $21,004 | -- |
| 1982 | 34,225 | * | 10,701 | 3,381 | ** | 10,267 | $3,423 |

  \* 120 percent of interest accruing after Dec. 31, 1984, on portion of underpayment attributable to a tax-motivated transaction.

  \*\* 50 percent of interest due on portion of underpayment attributable to negligence.

On brief, respondent concedes the sections 6651 and 6659 additions to tax.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioners invested in Cromwell Oil and Gas Associates (Cromwell), a Utah limited partnership that was part of a group of tax-oriented limited partnerships that had the stated general objective of, among other things, investing in enhanced oil

recovery (EOR) technology for the recovery of oil and natural gas.

After settlement of some issues, the primary issues in these cases are: (1) Whether activities of Cromwell were engaged in for profit under section 183; (2) whether stated debt obligations of Cromwell constituted genuine debt obligations giving rise to deductible interest; and (3) whether petitioners are liable for increased interest under section 6621(c) and additions to tax under sections 6653(a)(1) and (2) and 6661.

In the Krause test case opinion and in Vanderschraaf v. Commissioner, T.C. Memo. 1997-306, the first two of the above primary issues were decided against the taxpayers, and the third of the above primary issues was decided in favor of respondent as to the increased interest and in favor of the taxpayers as to the additions to tax.

This Court uses show cause procedures in situations similar to the instant cases where the disposition of pending cases may be affected by a previously decided "test case". See Lombardo v. Commissioner, 99 T.C. 342, 343-345 (1992), affd. sub nom. Davies v. Commissioner, 68 F.3d 1129 (9th Cir. 1995); Gray v. Commissioner, T.C. Memo. 1996-525; Finkelman v. Commissioner, T.C. Memo. 1994-158; Iowa Investors Baker v. Commissioner, T.C. Memo. 1992-490; Bokum v. Commissioner, T.C. Memo. 1990-21, affd. 992 F.2d 1136 (11th Cir. 1993).

Background

At the time their petitions were filed, petitioners resided in Santa Ana, California.

In Sweden, petitioner Pelle Karlsson obtained the approximate equivalent of a U.S. high school diploma. In the United States, petitioner Evelyn T. Karlsson obtained a high school diploma through the general educational development exam. Neither petitioner has a college degree, and neither petitioner has been enrolled in any courses or received any training in petroleum engineering, drilling technology, or geology. Neither petitioner has ever been employed in or had any professional involvement in the oil and gas industry.

In 1979, petitioners invested in Cromwell by transferring to Cromwell $30,000 in cash and by executing in favor of Cromwell promissory notes in the total face amount of $420,000. On the basis of such cash investment, the stated face amount of such promissory notes, and petitioners' stated obligation on Cromwell's debt obligations, petitioners claimed for the years in issue the following tax losses (consisting largely of accrued

royalties, licensing fees, and stated interest) and credits on their joint Federal income tax returns:

| Year | Losses Claimed | Credits Claimed |
|------|----------------|-----------------|
| 1979 | $119,481 | $ - |
| 1980 | 136,507 | 132 |
| 1981 | 130,215 | 208 |

In Krause v. Commissioner, 99 T.C. 132 (1992), we analyzed in detail the various EOR technology license and lease agreements and the purported partnership debt obligations relating thereto that were entered into by various of the limited partnerships (specifically including the license and lease agreements Technology Oil and Gas Associates 1980 (Technology-1980) entered into with Elektra Energy Corp. (Elektra) and with TexOil International Corp. (TexOil)), and we analyzed the state of development of the specific EOR technology involved in the partnership license agreements.

With regard to the excessive nature of the EOR technology license and lease agreements, we concluded in Krause that --

> The stated consideration agreed to by the partnerships for the license of EOR technology and for the lease of tar sands properties bore no relation to the value of that which was acquired, did not conform to industry norms, and precluded any realistic opportunity for profit.

> * * * the estimates used by the partnerships for projected oil recovery from the use and application of the EOR technology licensed by the partnerships are not

supported by credible expert testimony in this case and were not reasonable.  [Id. at 169; citations omitted.]

With regard to the lack of development of the EOR technology, we stated in Krause that the --

portfolio [of EOR technology] consisted of a package of vague, largely untested ideas, that, if and to the extent ever developed, would likely be available generally in the marketplace and on much more favorable terms than from the partnerships.  We reject petitioners' argument that the portfolio of EOR technology obtained by the partnerships represented anything of any substantial value.  The EOR technology license agreements entered into * * * were essentially valueless.  [Id. at 175.]

With regard to the lack of validity of the debt obligations of the partnerships, we stated in Krause that --

The multimillion dollar license fees and royalties * * * were excessive.  They did not reflect arm's-length obligations, and they are not to be recognized as legitimate obligations of the partnerships.  The debt obligations of the partnerships associated therewith did not constitute genuine debt obligations and are to be disregarded.  [Id. at 175; citations omitted.]

In summary, in Krause v. Commissioner, supra, among other things, we concluded that the partnerships, the various license and lease agreements, the EOR technology, and the purported debt obligations of the partnerships constituted nothing more than an elaborate tax shelter scheme, as follows:

In summary, presented to us in this case is a chain or multilayered series of obligations, stacked or multiplied on top of each other via the numerous partnerships to produce debt obligations in staggering dollar amounts, using a largely undeveloped and untested product, in a highly risky, very speculative, and nonarm's-length manner in an attempt to generate significant tax deductions for investors. The transactions did not, and do not, constitute legitimate for-profit business transactions. [Id. at 175-176.]

Based on our findings and opinion in Krause v. Commissioner, supra, the affirmance thereof by the U.S. Court of Appeals for the Tenth Circuit, and the denial of certiorari by the U.S. Supreme Court, thousands of investors who had invested in Technology-1980 and in other related limited partnerships, including Cromwell, settled their Federal income tax liabilities with respondent relating to these investments. Petitioners herein and respondent, however, have not been able to reach a settlement agreement, and petitioners allege the existence of material facts that they believe distinguish their limited partnership investments in Cromwell from the investments that were made by the taxpayers in Technology-1980 and that were specifically addressed in Krause v. Commissioner, supra.

We issued a show cause order, and we held an evidentiary hearing in connection with our show cause order to give petitioners an opportunity to establish how, for Federal income tax purposes, their limited partnership investments in Cromwell and how the activities of Cromwell are distinguishable from the

limited partnership investments in, and the activities of, Technology-1980, as described and as found in our Krause v. Commissioner, supra, opinion.

For the reasons stated below and based on the evidence admitted at the hearing on the show cause order, we conclude that, for Federal income tax purposes, the limited partnership investments in Cromwell and the activities of Cromwell are not distinguishable from the investments in and the activities of Technology-1980 as described in the Krause v. Commissioner, supra, opinion.

Discussion

In late 1978, 1979, and early 1980's, Winsor Savery, Richard B. Basile, E. Barger Miller, Werner Heim, Robert Shaftan, William Conklin, and other tax shelter promoters, who had no significant experience with oil and gas investments, participated in the formation of tax shelter limited partnerships (including Cromwell and Technology-1980) with the stated general investment objectives of drilling for oil and natural gas and of obtaining the rights to certain EOR technology that might be developed and become valuable if oil prices continued to rise dramatically in subsequent years.

Louis Coppage, the individual general partner of Cromwell, also had no experience with oil and gas exploration, production,

or investments. Rather, his experience involved the promotion of tax shelters.

For the right to use certain allegedly extant EOR technology, Cromwell agreed to pay Elektra fixed license fees of $35,000 per year for 5 years for each limited partnership unit sold to investors. Based on the 51 limited partnership units in Cromwell that were sold, Cromwell agreed to pay total fixed license fees to Elektra of $8,925,000.

Elektra, however, had obtained rights to use and license the same technology that it had licensed to Cromwell for only running royalties based on actual incremental increased recovery of oil attributable to use of the technology. Elektra was obligated to pay no fixed license fees for the technology.

Cromwell's license agreement with Elektra was not materially different from the license agreements entered into by Technology-1980 with Elektra.

For the right to use EOR technology on specified tar sands acreage in Utah and Wyoming, Cromwell agreed to pay TexOil a fixed minimum royalty of $5,000 per year for 20 years for each limited partnership unit sold to investors. On the basis of the 51 limited partnership units in Cromwell that were sold, Cromwell agreed to pay total minimum royalties to TexOil of $5,100,000.

TexOil, however, had agreed to pay a total of $100 an acre for the same tar sands acreage. Acreage assigned to Cromwell was

not materially different or more valuable than acreage assigned to Technology-1980. Like the tar sands acreage assigned to Technology-1980, none of the tar sands acreage assigned to Cromwell had any reserves or value as of 1979.

General explanatory material relating to the oil crisis of the late 1970's and early 1980's and a detailed explanation of the EOR technology involved in these cases are set forth in Krause and will not be repeated herein. See Krause v. Commissioner, supra at 134-136, 157-165.

Before investing in Cromwell, neither petitioners nor anyone hired or otherwise engaged on petitioners' behalf visited or inspected any of the Cromwell gas well sites in Louisiana or Cromwell's tar sands properties.

As in Krause, petitioners' experts rely on irrelevant generalities and theoretical exercises, ignoring crucial facts or making erroneous assumptions. Some of the claimed differences are based on pointless mathematical exercises. For example, petitioners' expert, Charles G. Bursell, calculates that, per investor dollar, Cromwell received from its tar sands leases in excess of three times the oil-in-place that Technology-1980 received. Bursell's attempt to make Cromwell appear the better investment simply fails to address the real problems in the transaction between Cromwell and TexOil, including the fact that the leased tar sands acreage had no value.

In comparing the cost of investing in Cromwell and the cost of investing in Technology-1980 and the due dates of the various debt obligations, Bursell erroneously assumes that the $80,000 portion of Cromwell's debt obligation for each partnership unit that was reflected by a nonrecourse promissory note actually would be paid.

Bursell points out that Cromwell's $120,000 promissory notes are not due until 2007, while the promissory notes of Technology-1980 were due between 1992 and 1995. We agree with respondent that this distinction is meaningless in the context of the tax sheltered and speculative transaction before us. If anything, the extended due date for the Cromwell promissory notes suggests that Cromwell's promissory notes were even more contingent than those of Technology-1980.

The distinction that Glenda Exploration and Development Corp. (GEDCO) was the managing general partner of Cromwell but only the cogeneral partner of Technology-1980 is not significant. GEDCO's role in all of the related partnerships effectively was the same.

The fact that Cromwell offered fewer partnership units than Technology-1980 is meaningless. All of the partnerships offered different numbers of partnership units.

Petitioners inaccurately allege that Cromwell was not restricted in its use of the EOR technology on the leased tar

sands properties and that Cromwell had a unique relationship with Todd Doscher, an internationally recognized expert in EOR technology. To the contrary, only Technology-1980's license had any provision for using the technology on additional property it might acquire, and any expertise that Todd Doscher had to offer would benefit all of the partnerships equally.

Petitioners argue that Cromwell's license for EOR technology reflected significantly more favorable terms than Technology-1980's license. As persuasively established, however, by respondent's expert, John R. Dosher of The Pace Consultants, Inc., in spite of nominal differences, the licenses of the various partnerships contained no material differences. Cromwell's license committed Cromwell to unjustified, fixed fees that were linked to the number of partnership units sold, and to an additional royalty on actual production.

Technology-1980's license provided the option for Technology-1980 to terminate its license and limit the fixed fees. Cromwell's license did not have this option.

While Cromwell's license provided for a reduction of the fixed fees based on production royalties actually paid, this provision would be meaningful only in the event of commercial production. Considering the unlikely chance that production would occur, any benefit from this provision is illusory.

Petitioners' experts emphasize that under Technology-1980's development license, Technology-1980 was obligated to pay $20,000 as an advance process royalty for each oil recovery installation that was actually constructed. Petitioners' experts, however, neglect the provision that would allow Technology-1980 to apply any such advance process royalty paid to reduce or offset the production royalty that would become due.

Petitioners emphasize that Cromwell agreed to pay a fourth for its license of EOR technology of what Technology-1980 agreed to pay. The only reason, however, that Cromwell was obligated to pay less for its license of EOR technology was that Cromwell sold fewer partnership units to investors. As stated, total license fees due from the partnerships were based on the number of partnership units sold.

Because the evidence establishes that the fixed license fees that were agreed to were not justified at all, that they did not bear any relationship to what was acquired, and that they were not normal in the oil and gas industry, nominal differences between Cromwell's stated license fees and Technology-1980's stated license fees do not constitute a material distinguishing fact.

Petitioners' expert, Bursell, testified that Cromwell's license fees for EOR technology were not particularly excessive in amount. Bursell, however, did not even know what Cromwell had

agreed to pay for the technology, and Bursell had no experience in the licensing of technology. Bursell never considered the fact that Cromwell could have obtained a license for the technology for a significantly reduced price and that Cromwell could have acquired the technology for only a running royalty.

Bursell made no economic analysis, and he did not opine as to whether Cromwell could have made a profit. He merely testified vaguely that technology in general could be costly. He gave no opinion as to whether Cromwell's license had value or whether the price agreed to by Cromwell for the technology was reasonable.

Jerry D. Ham, another of petitioners' experts, did not testify that Cromwell agreed to pay a fair market value price for the license of the EOR technology. Ham was unclear as to what technology, in 1979, was included in the portfolio, and he could not explain why Cromwell purchased the technology from Elektra or what Elektra was obligated to provide in return for the license fee. Also, Ham was not aware of what Elektra had agreed to pay for the technology it licensed to Cromwell. Ham's opinion as to the reasonableness of the license fee has no credibility.[1]

As respondent's expert explained in his testimony, the license fees for which Cromwell became obligated with respect to

---

[1] Interestingly, Ham's ultimate conclusion seems to be that, as a working interest owner who had hired an operator, there was really no need for Cromwell to license technology at all.

the EOR technology were excessive, unreasonable, and valueless. The fixed fees agreed to by Cromwell for license of the EOR technology were not competitive in the industry and were contrary to industry norms. Further, a prudent investor would not agree to pay substantial fixed fees for undeveloped, untested technology that could be licensed directly from the inventors for no fixed fees but for merely running royalties based on actual incremental production attributable to the technology.

Of petitioners' experts, only John Cayias attempts to address the potential profitability of Cromwell and thereby to justify Cromwell's license fees. Cayias' speculative economic projections, however, are not credible. Cayias' projections assume commercial development and a successful pilot of the technology. Cayias' projections do not account for the risk that a pilot would be unsuccessful nor the multimillion dollar cost of a pilot of the technology. Cromwell had only $153,000 for use on its tar sands properties, an amount totally deficient to fund the resource definition, coring, pilot, and other steps required just to get to the starting point of Cayias' projections. Cayias' failure to account for real costs and risks is inexcusable.

Cayias errs in his assumption that Cromwell alone, and no other partnership, would receive proceeds from development of the Burnt Hollow acreage, one of the tar sands properties. The proceeds from development of any Burnt Hollow acreage would have

to be shared among all of the partnerships, each burdened by its own debt obligations to Elektra and to TexOil.

Cayias errs in his projection that 50 percent of the oil in place would be recovered. This projection or assumption, based on Bursell's testimony, is not reasonable and is indefensible.

Cayias seeks to justify the large technology license fees for which Cromwell became obligated by a projection based on the application of traditional steam flood technology rather than on any technology licensed by Cromwell from Elektra. Cayias' analysis simply supports respondent's position that the license of a portfolio of EOR technology was totally unnecessary and unjustified.

The evidence establishes that the technology license fees for which Cromwell became obligated were not customary in the industry and were grossly overvalued. Petitioners have failed to distinguish this case from Krause v. Commissioner, 99 T.C. 132 (1992), with regard to the license fees for the EOR technology.

Petitioners also argue that Cromwell had a greater potential for profit than Technology-1980 because Cromwell agreed to pay less for its TexOil tar sands acreage than did Technology-1980. As respondent's expert, Henry J. Gruy, explained, however, the consideration agreed to by Cromwell with regard to the tar sands acreage still exceeded fair market value because, absent any reserves, its value was zero.

Gruy analyzed empirical data available for the Burnt Hollow area as of 1979 and established that the lighter oils in the Burnt Hollow reservoir had been flushed out by underground water over the course of geologic time. His analysis included plotting the porosity and oil saturation of a sample core from the Exeter-Hudson Mahoney No. 1 well located near Cromwell's acreage. His analysis of that sample revealed that the high porosity rock had little remaining saturation of oil and that higher saturations of oil were present only in poorer quality rock. Thus, in any fluid injection project on such property, the fluid would migrate to the better quality rock, bypassing the area of higher tar saturation.

Gruy's analysis is consistent with other wells drilled in the vicinity of the Cromwell acreage, including the so-called Sun State No. 2 (Sun) well from which flowed water, not oil. In the case of the Sun well, even steam heating of the reservoir yielded only minute quantities of oil, confirming Gruy's conclusion that these reservoirs were not amenable to steam injection recovery.

Petitioners' expert, Bursell, did not make any reserve analysis or predictions specific to Cromwell's properties. His reservoir analysis was limited solely to a review of the Sun pilot well and the Exeter-Hudson Mahoney core hole. Bursell evidently did not review the additional core data discussed in Gruy's report. In analyzing the Exeter-Hudson Mahoney core,

Bursell makes the inappropriate assumption that lost portions of this core contained oil bearing sands in the same proportion as the portion of the core recovered. Bursell's general testimony provides no support for the large, fixed fees that Cromwell agreed to pay.

Moreover, Bursell emphasized activities and data from the Kern River area in California. Cromwell, however, had no rights to acreage in the Kern River area, and Cromwell had no plans to acquire any. Also, the heavy oil located in the Kern River area had viscosity levels of only 4,000 to 5,000 centipoise (cp) at reservoir temperature and was not comparable to Cromwell's Burnt Hollow property with oil viscosity levels of 1,000,000 cp at reservoir temperature.

Significantly, Bursell neither opines as to whether Cromwell paid fair market value for its tar sands acreage nor as to the reasonableness of the specific transactions that Cromwell entered into.

Walter Austin, another of petitioners' experts, regarding Cromwell's lease of tar sands acreage incorrectly assumes that Cromwell was only obligated to pay the $610 cash portion of the royalties due per unit for the first 3 years. He viewed the remainder of Cromwell's royalty obligation as contingent. Austin never opines that Cromwell's annual 20-year, $5,000 per unit stated royalty obligation to TexOil represented fair market

value.  Austin's understanding of this transaction was minimal, and his testimony provides no credible support for petitioners' position in these cases.

Petitioners have established no credible differences between Cromwell's tar sands acreage and Technology-1980's tar sands acreage.  Both are worthless.

It is clear that the Cromwell and Technology-1980 limited partnerships share the same flaws.  The consideration that was agreed to for the EOR technology licenses and for the tar sands acreage bore no relation to the value of that which was acquired, did not conform to industry norms, and precluded any realistic opportunity for profit.  Cromwell's stated debt obligations relating to the multimillion dollar license fees and royalties that Cromwell agreed to pay were excessive.  They did not reflect arm's-length obligations, and they do not constitute valid debt obligations.  Krause v. Commissioner, 99 T.C. at 169. No material differences have been established or even marginally corroborated, and no credible arguments have been presented that distinguish these cases from Krause.

In addition to attempting to distinguish Cromwell factually from Technology-1980, petitioners affirmatively attack as erroneous a number of our specific findings of fact in Krause. Contrary to the Krause findings, petitioners affirmatively allege:  (1) The Burnt Hollow acreage constituted a heavy oil

property, not a tar sands property; (2) the Carmel VaporTherm technology was unique, and water for its use would be available at low cost; (3) testing is not critical to a determination of the usefulness of a particular technology; (4) it was not unreasonable to project that world oil prices would continue to rise; (5) the Monroe field was not 90 percent depleted; (6) Elektra had available the expertise of Todd Doscher, whose expertise alone made the EOR technology licensed by Cromwell valuable; (7) during the 1980's, there existed no industry norm for the license of EOR technology; (8) there existed proven ways to recover oil from tar sands properties, and the tar sands properties licensed by Cromwell had reserves of oil; and (9) Cromwell's estimates for recovery of oil from tar sands properties using the licensed EOR technology were reasonable.

We address each of petitioners' allegations in order.

(1) Bursell's and Ham's bald opinions that Burnt Hollow does not constitute a tar sands property are unsubstantiated and conflict with industry definitions. The Burnt Hollow property has an API gravity of 2 degrees and a viscosity of 1,000,000 cp at reservoir conditions, making this property a tar sands property under any recognized definition. Further, whether Burnt Hollow constitutes a heavy oil property or a tar sands property does not change the fact that Cromwell's acreage had no reserves.

(2) With regard to the Carmel VaporTherm technology, it is sufficient to reiterate that it was not known whether such technology would work on Cromwell's acreage, and Cromwell could have licensed the technology directly from the inventor for no fixed fees.

(3) The credible evidence establishes that pilot tests are necessary when there is not enough information available to know whether and how well a proposed technology and project would work.  This was Cromwell's situation.  It licensed untested, unknown technology, and it had always planned to do a pilot.  Any argument against the need for a pilot to test the usefulness of EOR technology conflicts both with respondent's experts and recognized industry practice and is not credible.

(4) Regarding energy price predictions, there is no dispute that many people expected oil prices to rise.  Respondent's experts took price increases into account in their analyses.  In Krause v. Commissioner, supra, we recognized the anxiety that existed in the late 1970's and early 1980's concerning future oil prices, and we still concluded that the stated consideration for the license from Elektra of EOR technology and for the lease from TexOil of tar sands acreage was unjustified.  The U.S. Court of Appeals for the Tenth Circuit reviewed our findings in this regard and found no error.  Hildebrand v. Commissioner, 28 F.3d at 1027-1028.

(5) Petitioners dispute that the Monroe field in Texas was 90 percent depleted when Cromwell acquired interests therein. Respondent's expert, Ronald Harrell, who has extensive experience with the Monroe field, did a reserve study of the Monroe field as of 1979 based on then available performance data from analogous wells in the Monroe field. This study establishes that Cromwell's acreage in the Monroe field, like Technology-1980's acreage, would not support economically viable oil leases.

Petitioners' contention that the Monroe field was less than 60 percent depleted is not supported by any credible evidence. Petitioners rely primarily on speculative testimony from Ham that the Monroe field constitutes a condensate field in which fluid buildup around the wells gives the false appearance that the reservoir is depleted. Ham presented absolutely no data or testing to support his theory. Respondent's expert, Harrell, explained that the Monroe field was recognized throughout the industry as not qualifying as a condensate field. Petitioners' claim that the Monroe field was not 90 percent depleted is not supported by any credible evidence.

(6) Petitioners' argument that the affiliation of Tom Doscher, a renowned expert, with the partnerships justified the large license fees is flawed in many respects. First, in 1979 when Cromwell entered into the license agreements, Doscher was not in any way affiliated with Elektra. In 1981, when Doscher

did become somewhat involved with Elektra, he committed to working for Elektra or the related partnerships only 10 hours per calendar quarter. Also, the various partnerships, including Cromwell, were obligated to pay significant additional fees under separate contracts for Doscher's services at Burnt Hollow. Further, as of 1979, all of Doscher's technology patents had been assigned to Shell Oil Co. and thus would not have been available to the partnerships. Doscher's services were not furnished under the Elektra license. Finally, during this time period, the services of a number of qualified thermal experts, including Doscher, were generally available. Clearly, Cromwell's exorbitant license fees are not justified merely because Doscher, in 1981, became affiliated on a limited basis with the partnerships.

(7) Petitioners' contention that during 1979 through 1982 fixed fees for licenses of technology were not unusual is not supported by any credible evidence. Ham's testimony is based largely on irrelevant property transactions and drilling deals and on incomplete information. The fluidized bed technology that he discusses does not even constitute an oil recovery technology. Ham refers to up-front fees charged by Carmel Energy Corp., but he ignores the fact that those fees represented a component for engineering services, not a license for technology. Ultimately, Ham acknowledges that he was not aware of other transactions

involving EOR technology with terms similar to Cromwell's license with Elektra that reflected substantial fixed fees for technology.

(8) Ham's vague testimony regarding the existence of proven methods of recovery of oil from the Utah and Wyoming tar sands is not credible. Ham incorrectly treats as a "proven" technology a technology which is technically feasible, even if only minute quantities of oil are recovered and regardless of the economics.

Ham makes vague reference to tests in the Utah tar sands conducted by Shell, Laramie Energy Research Center, and the Energy Research and Development Administration, but he provides no specifics as to the results of the tests so we can evaluate their relevance to these cases. In contrast, respondent's expert Henry J. Gruy, provides specific details and analysis of four Utah tar sand projects. The evidence indicates that these projects were not commercial successes.

Petitioners challenge our finding in Krause v. Commissioner, 99 T.C. 132 (1992), that there were neither proven nor probable reserves of oil on the leased tar sands properties and that commercial development was highly speculative. None of petitioners' experts, however, did a reserve study for any of Cromwell's tar sands properties. Only Gruy completed reserve studies, and his conclusions are consistent with the Court's findings.

Ham suggests that there were probable reserves on the Utah tar sands properties, but Ham provides no reliable data or support for this assertion. At trial, Ham testified that the Utah tar sands properties had possible reserves. Regarding Burnt Hollow, he speaks vaguely in terms of "secondary reserves" and "a lot of reserves" without any greater precision. Even petitioners' other experts would not agree with Ham on this matter. Neither Austin, Bursell, nor Cayias makes similar assertions or speaks in terms of reserves. In fact, Cayias characterizes Burnt Hollow as "an exploration type risk".

(9) Relying primarily on Bursell's estimates of a 50-percent recovery rate, petitioners dispute our finding that Cromwell's 20- to 70-percent oil recovery estimates were unreasonable. Bursell's 50-percent recovery estimate, however, itself is flawed. Bursell uses a hypothetical viscosity for Burnt Hollow oil of 10,000 cp at 90 degrees Fahrenheit. He then plots this hypothetical viscosity on a laboratory-derived curve correlating viscosity and recovery. Bursell's theoretical viscosity, however, for Burnt Hollow is incorrect. Even at 102 degrees Fahrenheit, the viscosity of the tar at Burnt Hollow was indicated at over 1,000,000 cp. At 90 degrees Fahrenheit, the tar would be even thicker, and the viscosity higher, nowhere near the 10,000 cp that Bursell uses. In making his calculations, Bursell evidently did not have and did not consider the actual data from Burnt Hollow. Factoring in this data on Bursell's

correlation curve by plotting the actual 1,000,000 cp plus viscosity of the tar at Burnt Hollow at 90 degrees Fahrenheit, projected oil recovery approaches zero.

Petitioners also dispute our findings in Krause v. Commissioner, supra, that Cromwell's offering memorandum was misleading and overly optimistic in describing the licensed EOR technology. Petitioners make reference to Government investment in EOR technology and to projections of possible cumulative production. Petitioners make unsupported projections of conceivable profit from a single EOR technology. This is not persuasive. Petitioners make no attempt to tie any of this general material into the specifics and reality of Cromwell's activity.

Similar to the offering memorandum of Technology-1980, Cromwell's offering memorandum is not candid about the small likelihood of successfully applying unconventional and undeveloped EOR technology to properties with no history of success and where the oil resource has not been defined.

In summary, the material factual differences that petitioners allege exist as between their investments in and the activities of Cromwell and the investments in and activities of Technology-1980, as found in Krause v. Commissioner, supra, are not supported by any credible evidence.

Petitioners make no explicit claim that we, in the Krause v. Commissioner, supra, opinion, made any error of law, but

petitioners imply that profit motive should be analyzed at the individual partner level, not at the partnership level.  We recently held to the contrary in <u>Vanderschraff v. Commissioner</u>, T.C. Memo. 1997-306.  We incorporate herein our analysis and conclusion in <u>Vanderschraaf</u> on this legal issue.

In light of our resolution of the above issues (namely, the lack of profit objective of Cromwell and the nongenuine nature of Cromwell's debt obligations) on the bases explained, other arguments made by respondent with regard to the disallowance of Cromwell's claimed losses and credits need not be addressed.

With regard to the additions to tax under sections 6653(a)(1) and (2) and 6661, we incorporate herein our analyses and findings as set forth in our <u>Krause v. Commissioner</u>, <u>supra</u>, and <u>Vanderschraff v. Commissioner</u>, <u>supra</u>, opinions.  For the reasons stated therein, we do not sustain respondent's imposition of the additions to tax.

As we explained in <u>Krause v. Commissioner</u>, <u>supra</u> at 180, imposition of increased interest under section 6621(c), and its predecessor section 6621(d), is more automatic.  Section 6621(c) provided an increased rate of interest for substantial underpayments attributable to tax-motivated transactions. Substantial underpayments are defined as underpayments in excess of $1,000.  By regulation, among the types of transactions that are considered to be tax-motivated transactions within the meaning of section 6621(c) are those with respect to which the

related tax deductions are disallowed under section 183 for lack of profit objective. <u>Rybak v. Commissioner</u>, 91 T.C. 524, 568 (1988); sec. 301.6621-2T, A-4(1), Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984). In light of our findings as to the lack of profit objective, petitioners are liable for increased interest under section 6621(c).

For the reasons stated,

<u>Appropriate orders and</u>

<u>decisions will be entered</u>.