T.C. Memo. 1997-441


UNITED STATES TAX COURT


FRANK E. ACIERNO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 45438-86.          Filed September 25, 1997.


<u>Declan J. O'Donnell</u>, for petitioner.

<u>Elizabeth Girafalco Chirich</u> and <u>Marion S. Friedman</u>, for respondent.


MEMORANDUM OPINION


SWIFT, <u>Judge</u>:  This matter is before us on our order to show cause why resolution of the issues in this case should not be controlled by resolution of these same issues in our test case opinion in <u>Krause v. Commissioner</u>, 99 T.C. 132 (1992), affd. sub nom. <u>Hildebrand v. Commissioner</u>, 28 F.3d 1024 (10th Cir. 1994).

Krause involved limited partnership investments related to and similar to those in which petitioner herein invested and which are at issue in this case. See also Karlsson v. Commissioner, T.C. Memo. 1997-432, and Vanderschraaf v. Commissioner, T.C. Memo. 1997-306, which also involved partnership investments and issues related to and similar to those in which petitioner herein invested and which resolved the issues in a manner consistent with Krause.

Respondent determined a deficiency in petitioner's Federal income tax and additions to tax as follows:

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6661 |
| 1982 | $364,452 | $18,223 | * | $36,445 |

* 50 percent of interest due on portion of underpayment attributable to negligence.

Unless otherwise indicated, all section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioner invested in Drake Oil Technology Partners (Drake), a Pennsylvania limited partnership that was part of a group of tax-oriented limited partnerships with the stated general objective of, among other things, investing in enhanced oil recovery (EOR) technology for the recovery of oil and natural gas.

The primary issues for decisions are: (1) Whether activities of Drake were engaged in for profit under section 183; (2) whether stated debt obligations of Drake constitute genuine debt obligations giving rise to deductible interest; and (3) whether petitioner is liable for the additions to tax.

In the Krause test case opinion, in Vanderschraaf, and in Karlsson, the first two of the above issues were decided against the taxpayers, and the third issue was decided against respondent.

This Court uses show cause procedures in situations similar to the instant case where the disposition of the pending case may be affected by a previously decided test case. See Lombardo v. Commissioner, 99 T.C. 342, 343-345 (1992), affd. sub nom. Davies v. Commissioner, 68 F.3d 1129 (9th Cir. 1995); Gray v. Commissioner, T.C. Memo. 1996-525; Finkelman v. Commissioner, T.C. Memo. 1994-158; Iowa Investors Baker v. Commissioner, T.C. Memo. 1992-490; Bokum v. Commissioner, T.C. Memo. 1990-21, affd. 992 F.2d 1136 (11th Cir. 1993).

## Background

Many of the relevant facts have been stipulated and are so found. The entire trial record and the testimony and exhibits admitted into evidence in our test case opinion in Krause v. Commissioner, supra at 133-167, have been stipulated as part of the trial record herein. As stated, Krause involved limited

partnership investments that are closely related to the limited partnership investment at issue herein.

Background and other general facts as they were found in Krause that relate directly and indirectly to the partnership investments involved herein we, by this reference, incorporate as findings of fact in the instant case.

At the time his petition was filed, petitioner resided in Greenville, Delaware.

Of the total $75,909,492 cumulative losses reported by Drake on its Federal partnership income tax returns for 1981 through 1984 and passed through to the limited partners of Drake, $72,620,000 related to the EOR license fees purportedly owed by Drake.

In Krause v. Commissioner, supra, we analyzed in detail the various EOR technology license and lease agreements and the purported partnership debt obligations relating thereto that were entered into by various of the limited partnerships (specifically including Barton Enhanced Oil Production Income Fund (Barton), which is closely related to Drake), and we analyzed the state of development of the specific EOR technology involved in the partnership license agreements.

With regard to the excessive nature of the EOR technology license agreements, we concluded in Krause that --

> The stated consideration agreed to by the partnerships
> for the license of EOR technology * * * bore no

relation to the value of that which was acquired, did not conform to industry norms, and precluded any realistic opportunity for profit.

the estimates used by the partnerships for projected oil recovery from the use and application of the EOR technology licensed by the partnerships are not supported by credible expert testimony in this case and were not reasonable.  [Id. at 169; citations omitted.]

With regard to the lack of development of the EOR technology, we stated in Krause that the --

portfolio [of EOR technology] consisted of a package of vague, largely untested ideas, that, if and to the extent ever developed, would likely be available generally in the marketplace and on much more favorable terms than from the partnerships.  We reject petitioners' argument that the portfolio of EOR technology obtained by the partnerships represented anything of any substantial value.  The EOR technology license agreements entered into * * * were essentially valueless.  [Krause v. Commissioner, 99 T.C. at 175.]

With regard to the lack of validity of the debt obligations of the partnerships, we stated in Krause that --

The multimillion dollar license fees and royalties * * * were excessive.  They did not reflect arm's-length obligations, and they are not to be recognized as legitimate obligations of the partnerships.  The debt obligations of the partnerships associated therewith did not constitute genuine debt obligations and are to be disregarded.  [Id.; citations omitted.]

In summary, in Krause, among other things, we concluded that the partnerships, the various license and lease agreements, the EOR technology, and the purported debt obligations of the

partnerships constituted nothing more than an elaborate tax shelter scheme, as follows:

> In summary, presented to us in this case is a chain or multilayered series of obligations, stacked or multiplied on top of each other via the numerous partnerships to produce debt obligations in staggering dollar amounts, using a largely undeveloped and untested product, in a highly risky, very speculative, and nonarm's-length manner in an attempt to generate significant tax deductions for investors. The transactions did not, and do not, constitute legitimate for-profit business transactions. [Id. at 175-176.]

On the basis of our findings and opinion in Krause, the affirmance thereof by the U.S. Court of Appeals for the Tenth Circuit, and the denial of certiorari by the U.S. Supreme Court, thousands of investors who had invested in Barton and in other related limited partnerships, including Drake, settled their Federal income tax liabilities with respondent relating to these investments. Petitioner herein and respondent, however, have not been able to reach a settlement agreement, and petitioner alleges the existence of material facts that he believes distinguish his limited partnership investment in Drake from the investments that were made by the taxpayers in Barton and that were specifically addressed in Krause.

We issued a show cause order, and we held an evidentiary hearing in connection with our show cause order to give petitioner an opportunity to establish how, for Federal income tax purposes, his limited partnership investment in Drake and the activities of Drake were distinguishable from the limited

partnership investments in, and the activities of, Barton as described and as found in Krause.

On the basis of the evidence admitted at the hearing on the show cause order and for the reasons stated below, we conclude that, for Federal income tax purposes, petitioner's limited partnership investment in Drake, the activities of Drake, and the purported debt obligations of Drake are not distinguishable from the investments in, the activities of, and the purported debt obligations of Barton as described in the Krause opinion.

Discussion

In late 1978 or 1979, Winsor Savery, Richard B. Basile, E. Barger Miller, Werner Heim, Robert Shaftan, William Conklin, and other tax shelter promoters who had no significant experience with oil and gas investments began forming tax shelter limited partnerships (including Drake and Barton) with the stated general investment objectives of drilling for oil and natural gas and of obtaining the rights to certain EOR technology that might be developed and become valuable if oil prices continued to rise dramatically in subsequent years.

Partnerships were formed each year from 1979 through 1984, with slight differences in general partners, structure, properties, and activities depending on the year the partnerships were formed. Drake was formed as a 1981 Denver partnership with Louis Coppage as the individual general partner. Barton was formed as a 1982 Wichita partnership with Gary Krause as the

individual general partner.  As stated, Barton was involved directly in the Krause case.

All of the 1979 and 1980 partnerships invested in the Monroe gas field in Texas and leased tar sands acreage in Utah.  The 1981 and 1982 partnerships, including Drake and Barton, did not invest in the Monroe gas field, nor in the tar sands acreage.

All of the 1981 and 1982 partnerships undertook various oil and gas activities in fields such as the Illinois Basin, Castaic Hills, and elsewhere, the activities of which were not challenged by respondent.  In spite of such other activities, however, we still found in Krause v. Commissioner, supra at 150-157, that Barton's activities were not engaged in with an actual and honest profit objective and that its EOR technology license fees were excessive, did not reflect arm's-length obligations, and were not to be recognized as legitimate debt obligations of Barton.  See id. at 169, 175.

There were 363.1 limited partnership units in Drake sold to 270 limited partners.  By 1982, Drake had 275 limited partners.

The total stated subscription price for each limited partnership unit in Drake was $150,000, payable by each limited partner as follows:

| Cash | Promissory Note | Due Date |
|---|---|---|
| $12,500 | --- | On subscription |
| --- | $12,500 | April 15, 1982 |
| --- | 12,500 | April 15, 1983 |

The $112,500 balance (including simple interest at 7 percent per year) of each limited partner's $150,000 total subscription fee per partnership unit was deferred and was stated to be due in approximately 15 years (namely, in 1994, 1995, and 1996).

On the basis of the number of limited partnership units in Drake that were sold, the investors in Drake owed Drake the following stated total amounts:

| Cash & Short-Term Debt Due In First 3 Years | Purported Recourse Long-Term Debt Obligations Due In 1994-1996 |
|---|---|
| $13,616,000 | $40,849,000 |

In spite of the large short- and long-term debt obligations nominally associated with investments in Drake, no credit investigations were undertaken by Drake with regard to the creditworthiness of the limited partners who invested in Drake.

On December 29, 1981, petitioner subscribed to 10 partnership units in Drake, and petitioner executed in connection therewith one promissory note to Drake in the stated principal amount of $12,500 due on April 15, 1982, and another promissory note to Drake in the stated principal amount of $25,000 due on December 15, 1983.

Petitioner did not have any oil or gas experience, did not conduct any outside investigation of any persons, entities, or properties mentioned in Drake's offering memorandum, and did not hire an expert to evaluate the investment. Petitioner did not

investigate the underlying facts, assumptions, opinions, or tax treatment of deductions presented in the offering memoranda. Petitioner relied solely on his accountant, who recommended to him the investment in Drake. Petitioner was aware that his accountant received commissions from Drake based on the number of investors referred to Drake who purchased partnership units in Drake.

The evidence does not establish that petitioner made the full principal and interest payments due in 1982 and 1983, and petitioner did not make payments on the stated debt obligations due in 1994 and 1995 relating to his purchase of limited partnership units in Drake.

Petitioner alleges many material differences between Drake and Barton. Respondent counters that no material differences between Drake and Barton have been established and that the Court's holding in Krause v. Commissioner, 99 T.C. 132 (1992), should apply to resolution of the issues before us in this case.

Petitioner has not credibly explained or established, either at the show cause hearing or in his briefs, why any of the alleged factual differences between Drake and Barton would be material. Some of the alleged differences are minute and pointless. Petitioner ignores the similarities between Drake and Barton, which are controlling.

As explained, the stated business objective of Drake, per its offering memorandum, was to acquire producing oil wells and

to apply EOR technology to the production of oil from the wells. Drake, like Barton, did not participate in any transactions involving the lease of tar sands properties from TexOil International Corp. nor the lease of natural gas properties in the Monroe gas field in Louisiana. See id. at 150-157.

Drake and the related partnerships, as described in detail in Krause v. Commissioner, supra at 140-143, 152-157, entered into license agreements either with Elektra Energy Corp. (Elektra) or with Hemisphere Licensing Corp. (Hemisphere) to obtain limited rights to use certain purported EOR technology in the production of oil.

General explanatory material relating to the oil crisis of the late 1970's and early 1980's and a detailed explanation of the EOR technology involved herein are set forth in Krause and will not be repeated herein. See id. at 134-136, 157-165.

The EOR technology licensed by Drake constituted essentially the same EOR technology as that licensed to many of the other related partnerships, including Barton and other partnerships involved in the Krause test case. Id. at 157-165.

Under the EOR license agreement that was entered into between Drake and Hemisphere, Drake nominally agreed to pay fixed license fees to Hemisphere of $50,000 per partnership unit per year for 5 years.

Drake's annual $50,000 per partnership unit technology license fee to Hemisphere was to be paid, during each of the 5

years it was nominally due, through the following combination of cash and partnership promissory notes:

| Year | Per Partnership Unit | |
| | Cash | Partnership Promissory Note |
| --- | --- | --- |
| 1 | $3,500 | $ 46,500 |
| 2 | 2,800 | 47,200 |
| 3 | 2,000 | 48,000 |
| 4 | -0- | 50,000 |
| 5 | -0- | 50,000 |

Drake's purported debt obligations to Hemisphere with regard to the above technology license fees were never reduced to written promissory notes.

By executing the subscription agreements with regard to their investments in Drake, each limited partner of Drake purported to assume personal liability on Drake's stated debt obligations to Hemisphere under the technology license agreement to the extent of the unpaid portion of each limited partner's per-unit stated $112,500 deferred capital contribution obligation to Drake.

Other related partnerships, under similar license agreements of the same EOR technology, agreed to stated debt obligations to Hemisphere in total stated principal amounts ranging from $7.2 million to $87.7 million, and the total principal amount in each case depended on the number of limited partnership units that were sold to investors.

Total fixed EOR license fees agreed to by the five so-called Denver-1981 partnerships and the two Denver-1982 partnerships (groups of particularly related limited partnerships which included Drake) totaled $310,214,500.

Hemisphere, however, had obtained rights to use and license the same EOR technology that it had licensed to Drake for running royalties based on actual incremental increased recovery of oil attributable to use of the technology. Hemisphere was obligated to pay no fixed license fees for the EOR technology.

Of the total cash contributions received from limited partners by the five Denver-1981 partnerships (including Drake), excessive amounts were paid to various promoters, lawyers, accountants, and salesmen, and little was available for development of EOR technology. Expenses paid apparently relating just to formation and organization of the five Denver-1981 partnerships including Drake totaled $552,468.

In his capacity as general partner of various related partnerships, Coppage received approximately $2,061,925, of which $272,325 was received from Drake. Coppage's wholly owned corporation, related entities, and employees thereof directly or indirectly received at least an additional $504,443.

Various salesmen received a total of $4,143,515 in connection with the sale of limited partnership units in the five Denver-1981 partnerships.

A law firm named Somers & Altenbach received $583,555 for purported legal services and for agreeing to defend, in subsequent years, tax benefits that were to be claimed in connection with the Denver-1981 partnership investments. The fee of Somers & Altenbach was based on 1-percentage point of total funds raised by the five Denver-1981 partnerships.

Many of the legal, economic, and technical opinions obtained by Drake and the other related partnerships relied on unrealistic and unreliable representations made by individuals who invested in the partnerships, who were involved in promoting the partnerships, and who received fees from the partnerships based on the number of limited partnership units sold.

Petitioner alleges that Drake's lack of participation in the TexOil tar sands acreage leased to the earlier 1979 and 1980 partnerships is not comparable with investments Drake (and the other Denver partnerships) allegedly made in later years in other, unrelated tar sands acreage in Utah. There is no credible evidence as to how an investment in other tar sands properties might justify the EOR license fees. Petitioner's expert, Thomas Logan, provided no explanation in this regard. There existed no proven reserves in the various tar sands properties and no proven methods for recovering commercial quantities of oil from the tar sands.

Petitioner attempts to distinguish Drake because Drake invested in oil wells located in the Illinois Basin. Barton, however, which was involved in our test case, <u>Krause v. Commissioner</u>, 99 T.C. 132 (1992), also invested in oil wells located in the Illinois Basin. Drake's activity in the Illinois Basin and elsewhere in no way justifies the EOR license fees to which Drake agreed.

Drake realized income from oil and gas activities in the Illinois Basin equivalent to less than 1 percent of the license fees accrued (without regard to interest). Drake's activities in other oil and gas fields yielded even less income.

In 1983, the best year for the Illinois Basin joint venture in which Drake participated with other partnerships, revenue from oil and gas sales totaled $3,243,148. After expenses, Drake was allocated $309,776 of these sales proceeds, less than 2 percent of the license fees Drake owed.

Petitioner alleges that Coppage, Drake's individual managing general partner, was not among the original creators of this tax shelter partnership and that he was not tainted by many of the non-arm's-length features of the partnerships. To the contrary, the evidence is clear that Coppage entered into the license agreements on behalf of Drake without negotiating the price. There is no credible evidence that Coppage relied on anyone

independent of the shelter promoters in making decisions regarding Drake's initial operations and financial commitments.

Coppage did retain a lawyer, Renno L. Peterson, to review Drake's offering memorandum.  Peterson expressed criticism about significant aspects of the Drake partnership, but the changes Peterson recommended were not implemented.

Petitioner alleges differences in the license agreements between the Drake and Barton partnerships, on the one hand, and a number of the other partnerships, on the other hand.  Petitioner incorrectly alleges that, under their EOR license agreement, Drake and Barton had the right to use the technology in a commercial project but that the other partnerships did not have such right.  All partnerships, however, had the right to use the EOR technology in a commercial project.  Drake and Barton had a single technology license agreement permitting both testing and commercialization, whereas many of the other partnerships had one license that allowed use of the technology only for testing and another separate license for a commercial project.  No evidence indicates that this difference in format is material.  Under either license format, use of the technology on a commercial project was permitted, but the fixed license fees were based on the number of partnership units sold, and under both license formats, the partnerships would be obligated to pay additional

royalties if any actual production resulted from use of the licensed EOR technology.

Other differences alleged by petitioner have no significance.

All of the partnerships, including Drake and Barton, were organized around similar stated fixed license fees that were based on a portfolio of technology, the total amount of which was based on the number of partnership units sold.  The licensed technology was either merely conceptual or could have been obtained with no fixed fees.  Krause v. Commissioner, supra at 158-163.

The stated consideration that Drake agreed to pay for the licenses was excessive, did not bear any relationship to what was acquired, and was designed to generate deductions that would produce losses for the investors far in excess of what they contributed in cash to the partnerships.  Neither Basile, Coppage, nor Krause independently investigated or attempted to determine the fair market value of the licenses.  Id. at 146, 155.

At the time the partnerships obtained licenses of EOR technology, the partnerships had no idea what technology they might need or whether the technology they had licensed would, or even could, be utilized.  This is true for all of the partnerships, whether they had leased acreage in the Utah tar

sands, like Technology-1980, id. at 143, had no rights to acquire any oil and gas properties at all, like Barton, id. at 151, or had options on the Parker Field oil field, like Drake.

Drake's license of a portfolio of EOR technology with exorbitant fixed fees and with no knowledge of whether the technology would be needed, or would even work, was not consistent with industry standards. Id. at 140, 169. What Drake did after it licensed the technology does not overcome the defects present with the original EOR technology license -- the licensing of EOR technology for grossly exorbitant fees that establish that the investment was a tax shelter and that the partnerships lacked a profit objective.

Petitioner alleges that certain findings made in the Krause opinion are erroneous. The evidence produced at the show cause hearing, however, does not raise any credible doubt as to the correctness of the Krause findings of fact.

For example, petitioner challenges the Krause finding that, in the oil industry, license fees for use of EOR technology were customarily based only on incremental increased production attributable to the technology. No evidence, however, was produced at the show cause hearing to support this claim.

Petitioner alleges that Drake's attempted reorganization in 1987 would support a finding that Drake was significantly different from Barton. The partnerships involved in the Krause

test case, however, also reorganized in a manner similar to Drake's reorganization. In 1986, the partnerships involved in Krause, including Barton, amended their EOR technology license with Hemisphere and significantly reduced the annual license fee owed. Krause v. Commissioner, supra at 157. Petitioner's attempt to distinguish Drake from the Krause partnerships is completely unsupported by the evidence.

Petitioner cites a number of cases and appears to argue that his investment in Drake is, on legal grounds, distinguishable from the partnerships involved in Krause. Petitioner's case authority is miscited and in no way supports petitioner's position herein. See also Karlsson v. Commissioner, T.C. Memo. 1997-432; Vanderschraaf v. Commissioner, T.C. Memo. 1997-306.

Drake shares the same controlling characteristics as Barton and the other partnerships involved in the Krause opinion. No credible, material differences have been established, and no persuasive arguments have been presented that distinguish Drake from the Krause test case partnerships.

In light of our resolution of the above issues (namely, the lack of profit objective of Drake and the nongenuine nature of Drake's debt obligations) on the bases explained, other arguments made by respondent with regard to the disallowance of Drake's claimed losses and credits need not be addressed.

Turning to the additions to tax, our analyses in the related Krause, Karlsson, and Vanderschraaf opinions, on general terms, of the additions to tax at issue provide adequate support for our decision herein not to sustain respondent's determinations as to the sections 6653(a)(1) and (2) and 6661 additions to tax.  We so hold.

An appropriate order
and decision will be entered.